**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case Number 21-cr-90-PLF** |
| **NATHANIEL DEGRAVE,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT NATHANIEL DEGRAVE'S MOTION FOR BOND**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to the defendant's oral motion for bond made at his arraignment on March 16, 2021. The government requests that the defendant continue to be detained pending trial pursuant to 18 U.S.C. § 3142 (f)(2)(B) (Serious Risk to Obstruct Justice). The government requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the bond hearing, be considered in the Court's determination regarding pretrial detention.

I.     **Procedural History**

On January 28, 2021, the District Court for the District of Columbia issued an arrest warrant pursuant to the filed complaint charging the defendant Nathaniel DeGrave with one felony count of Obstructing Law Enforcement Incident to Civil Disorder (in violation of 18 U.S.C. § 231(a)(3)) and two misdemeanor counts related to his unlawful and disorderly conduct at the U.S. Capitol Grounds and U.S. Capitol Building. These charges stemmed from his actions on January 6, 2021, during the timeframe a joint session of the United States Congress had convened to certify the vote count of the Electoral College of the 2020 Presidential Election.

1

On January 28, 2021, the defendant was arrested in the District of Nevada on the arrest warrant mentioned above.  On February 3, 2021, U.S. Magistrate Judge Daniel Albregts of the District of Nevada ordered the defendant detained, finding that he was likely to obstruct justice and "would not follow any condition imposed by the court even if the court could fashion conditions to address flight risk, danger and obstruction of justice concerns."

On February 5, 2021, a federal grand jury in the District of Columbia returned a nine-count indictment charging him with various unlawful entry and disorderly conduct offenses as well as Assaulting Certain Officers, in violation of 18 U.S.C. § 111 (a felony under these facts), and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) & 2 (also a felony).

On March 16, 2021, the defendant was arraigned on the above charges, and his counsel orally moved for bond, citing his lack of a criminal history and close ties to the Las Vegas community and proffering a letter from the property manager at his apartment complex.  At the hearing, the Court sought clarity on whether the defendant was entitled to a detention hearing under the Bail Reform Act and thus eligible for detention.  This memorandum seeks to address this point as well as provide additional factual bases justifying the defendant's continued detention.

## II.   <u>Applicable Authority</u>

The legal issue posed by the Court to the parties is whether it has legal authority to hold a detention hearing in this case, thereby rendering the defendant statutorily eligible for detention.[1] The Bail Reform Act explicitly answers this question in the affirmative.  Pursuant to 18 U.S.C. § 3142(f)(2), the Court "*shall* hold a hearing to determine whether any condition or combination of

---

[1] The government's position, as it has been in other Capitol riot cases, is that the Bail Reform Act does not enable a detained defendant to seek reconsideration of whether a detention hearing was properly held in the first place, but rather only permits him to seek review of whether he should be detained under the § 3142(g) factors.  *See* 18 U.S.C. §§ 3142(f); 3145(b) (permitting a defendant detained by a magistrate judge to move the court having original jurisdiction for "revocation or amendment of the order").  The most natural reading of § 3145(b)'s reference to "amendment or revocation" is to a detention determination: a court amends or revokes the conditions of release or detention.  It does not "amend" or "revoke" a decision to proceed to a detention hearing in the first place.

conditions … will reasonably assure the appearance of such person as required and the safety of any other person and the community … upon motion of the attorney for the Government or upon the judicial officer's own motion in a case that involves a serious risk that such person will flee or a serious risk that such person will obstruct or attempt to obstruct justice[.]" *Id.* (emphasis added) (numbering and extraneous punctuation omitted).  Whatever the basis for detention, the BRA's plain language does not limit the Court's consideration of the factors under § 3142(g).  Indeed, exactly the opposite: section 3142(g) directs that judges "shall … take into account the available information concerning" the enumerated factors at the detention hearing.

The above provisions thus operate in two steps as follows.  First, the judicial officer, based on a "proffer of what the hearing might establish," must ascertain if one of the circumstances enumerated under § 3142(f) is present to "trigger[] a detention hearing."  *United States v. Singleton,* 182 F.3d 7, 9, 12 (D.C. Cir. 1999) (holding courts must use categorical approach to determine whether charged offense is a crime of violence triggering a detention hearing, and also discussing the § 3142(f)(2) triggers for detention).  The D.C. Circuit has instructed that "[t]he decision whether to hold a hearing occurs based on even less information than a decision to detain or release," and that imposing a "fact-intensive analysis at an earlier stage of the case than Congress appears to have intended" would "blur [the] two distinct statutory inquiries" set forth in sections 3142(f) and (g).  *See id.* at 12.  In other words, the evidentiary standard to trigger a detention hearing in the first place is lower than the preponderance or clear and convincing evidentiary standards applicable at the detention hearing itself.  *See id.*  If the government proffers evidence sufficient to meet this lower evidentiary threshold, the Court must hold a detention hearing.  *See id.*; 18 U.S.C. § 3142(f)(2).

At this second step in the process, the Court is required to consider the full panoply of factors under § 3142(g) to determine whether there are conditions of release that will reasonably assure the defendant's appearance in court and the safety of any other person and the community. *See Singleton*, 182 F.3d at 9; *see also United States v. Ailon-Ailon,* 875 F.3d 1334, 1336-37 (10th Cir. 2017) (setting forth same two-step process); *United States v. Holmes,* 438 F.Supp.2d 1340, 1341 (S.D. Fla. 2005) (reasoning that, under *Singleton*, a court "should evaluate all the factors in subsection (g) when making its detention determination . . . regardless of whether detention is sought under [§ 3142] (f)(1) or (f)(2)"); *United States v. Plata Hernandez,* 766 Fed. Appx. 651, 656 (10th Cir. 2019) ("The plain language of § 3142(f) pertains to what triggers the requirement that a detention hearing be held, not the factors that guide the detention decision.").

Judge Nichols recently came to the same conclusion in a Capitol riot case, finding that a detention hearing was appropriate under § 3142(f)(2) and considering the full range of 3142(g) factors, including the danger presented by the defendant to the community if he were released. *See United States v. Curzio*, 21-cr-41 (Minute Order dated Mar. 9, 2021).[2]  Judge Nichols ultimately ordered that the defendant remain in custody pending trial.

Prior to Judge Nichols's ruling, Judge Mehta also considered the interplay between sections 3142(f)(2) and 3142(g) in another Capitol riot case, *United States v. Riley*, 21-cr-69.  *See* Ex. A. He agreed with the two-step framework—i.e., that the statutory bases listed in §3142(f) serve as triggers for a detention hearing, and that once established, the Court may proceed to consider all the factors under § 3142(g) in deciding whether to detain the defendant.  Judge Mehta further found that the obstruction of justice trigger for a detention hearing was subject to a lower

---

[2] The transcript for the defendant's bond motion hearing has not yet been issued, but this is the government's understanding of Judge Nichols's oral ruling.  Once the transcript is issued, the government will supplement the record, as appropriate.

evidentiary standard than those applicable at the actual detention hearing, as the government needed only to proffer a serious risk of obstruction of justice to proceed to a detention hearing.

Judge Mehta held, however, that while the defendant's prior obstructive acts in the Capitol were compelling evidence of such a serious risk, he believed that the government was also required to proffer evidence supporting that the defendant posed a serious risk of obstruction to a *judicial* proceeding.  Judge Mehta cited several examples of such evidence, such as destroying evidence, assisting others in evading police, and directing others on how to stash evidence—examples which led him, in part, to find a serious risk of obstruction and ultimately detain another Capitol riot defendant.  *See United States v. Caldwell*, 21-cr-28 (D.D.C. 2021), ECF No. 75.  Because the government proffered no such evidence in *Riley*, Judge Mehta ordered the defendant released.  As will be discussed further below, this is not the case here, as the government has evidence of multiple obstructive acts by the defendant related to judicial proceedings sufficient to demonstrate a serious risk that he will attempt to obstruct justice in this case.  *See* 18 U.S.C. § 3142(f)(2)(B).

In another Capitol riot case, *United States v. Calhoun*, 21-cr-116, Judge Friedrich found that while the magistrate judge did not err in granting a detention hearing under § 3142(f)(2), she believed that there were conditions of release that could address the Court's concerns.[3]  She further found that the government must present evidence demonstrating a risk of obstructive acts tied to a judicial proceeding when relying on obstruction of justice grounds for detention.

Implicit in the statute is the ability to detain a defendant solely on obstruction of justice grounds, or on such grounds combined with flight risk and/or safety concerns.  Indeed, "[b]y its plain terms, 18 U.S.C. § 3142(f)(2)(B) permits this Court to order a defendant held without bond pending trial when the Court finds by clear and convincing evidence that no condition or

---

[3] As above, this is the government's understanding of Judge Friedrich's oral ruling without the benefit of having reviewed the transcript.

combination of conditions will reasonably prevent the defendant from obstructing justice." *United States v. Robertson*, 608 F. Supp. 2d 89, 92 (D.D.C. 2009) (Lambreth, J.) (detaining defendant pending trial on obstruction of justice grounds after finding that "prior efforts" to obstruct justice "speaks volumes"). Nothing in § 3142's text, however, limits the Court's consideration under § 3142(g) to the underlying basis for the detention hearing. Instead, once the government has established a circumstance "triggering a detention hearing," the court "must consider the enumerated factors" in § 3142(g), including dangerousness. *Singleton*, 182 F.3d at 9; *see also United States v. Gloster,* 969 F. Supp. 92, 95 (D.D.C. 1997).

The government seeks the defendant's continued detention pursuant to 18 U.S.C. § 3142 (f)(2)(B), as he poses a serious risk to obstruct justice. Under the Bail Reform Act, the government may proceed by way of proffer. *See, e.g.*, *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996); *United States v. Cabrera-Ortigoza*, 196 F.R.D. 271 (S.D. Cal. 2000); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 42 (D.D.C. 2013). The government further submits that because there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community or the integrity of this proceeding, the defendant should remain detained.

## III.   Factual Background

### A.  The Attack on the United States Capitol on January 6, 2021

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the

House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the

Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

## B.  Conduct Specific to the Defendant

### i.    *Planning and Coordination Pre-January 6*

On or about January 15, 2021, law enforcement reviewed the publicly-available content for the Facebook account of Ronald Sandlin,[4] one of the individuals who traveled with the defendant, Nathaniel DeGrave ("DeGrave"), to the Capitol and was present with him therein.  In one Facebook post from December 23, 2020, Sandlin posted as follows:

> Who is going to Washington D.C. on the 6th of January? I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon.[5]  If you are a patriot I believe it's your duty to be there. I see it as my civic responsibility. If you're going comment below or PM me so we can meet up.

DeGrave responded to Sandlin that he was "considering" joining him, and that he could "come to Nashville and drive there with you."  In a post on December 31, 2020, Sandlin announced his plans with the defendant and Josiah Colt[6] to travel to D.C. on January 6:

> Dear Patriots, I'm organizing a caravan of patriots who are going to Washington D.C. to stand behind our president Donald J. Trump.  I

---

[4] Sandlin was present with the defendant inside the Capitol during the riot and has been indicted on multiple charges, including Assaulting Certain Officers, in violation of 18 U.S.C. § 111, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) & 2.

[5] This phrase apparently is a reference to Julius Caesar's crossing the Rubicon River and signifies committing oneself "irrevocably to a risky or revolutionary course of action, similar to the modern phrase 'passing the point of no return.'"  *See* https://en.wikipedia.org/wiki/Crossing_the_Rubicon.

[6] Colt was present with the defendant inside the Capitol building during the riot and has been indicted on multiple offenses in connection with the Capitol riot.  Unlike Sandlin and DeGrave, he has not been charged with assaulting law enforcement officers and turned himself in.  The government did not seek Colt's detention pending trial.

posted about this last week and a got almost a dozen messages from people asking how they can help or expressing their wish to participate somehow.  Josiah Colt, Nate DeGrave, and myself have already booked and paid for our trip to Washington D.C. but we could use your help and support!  Every dollar you contribute to us is a smack in the face to Antifa.  Every penny is a boot in the ass against tyranny.  Every Buffalo nickel is a body slam against China.  If you can't be there in person this is the next best thing.  We will be documenting our journey and every contributer will get a personal thank you video shot on location in Washington D.C. and will be featured as a contributor on the video mini documentary.  Share, comment, like, and hate on us in the comments.

The post also contains a link to a GoFundMe webpage[7] with Sandlin's face superimposed on that of an individual in a car holding what appears to be a semi-automatic rifle.  In response to the post with the GoFundMe link described above, DeGrave posted a comment stating that "[i]t's time the American people rise and stand up for this country.  We're tired of the corruption."

In response to a search warrant for DeGrave's Facebook account, Facebook returned posts and conversations in which the defendant stated that media reports stating that Joe Biden won the election were "fake news," and that President Trump had in fact won.  He described media outlets such as "cnn, ny times, abc, fox, associated press" as "the fakers of the fake."  When an individual confronted the defendant asking whether the media outlets were "all lying when they say Joe Biden won the election," he responded, "Correct."  In the same conversation, the defendant told the individual that "[w]hen Trump wins they will say he 'stole the election'" and that "[t]his is all going according to plan. You will see."  He later started posting the hashtag "#neverconcede."

More significantly, the defendant's Facebook return reflects coordination and planning for violence in D.C. on January 6.  In one December 30, 2020 conversation, Sandlin wrote the defendant, "Yo sorry bro I'm going back and fourth [sic] about going some people I respect are

---

[7] GoFundMe is a social fundraising online platform allowing individuals to raise money for a particular cause or reason.

saying it may get dangerous" and then "Are you down for danger bro?"  DeGrave responded, "Im bringing bullet proof clothing" and "yes."

The next day, on December 31, 2020, the defendant posted on Facebook asking: "Who can shoot and has excellent aim and can teach me today or tomorrow."  In response to other users' comments to this post, he wrote "I want somebody special forces or ex fbi to teach me"; "I want personalized training from the best"; and "I'm open to learning all the essential skills. Whatever is necessary to survive."  When a user recommended a particular person for the task and advised "he's not cheap," the defendant responded that "this is for a very patriotic cause."  In a private conversation with another Facebook user that same day, DeGrave wrote that he would be in D.C. on the 6th with Sandlin and Colt, and that he wanted to "grow my army strong so probably will be making connections out there."

Beginning on December 31, 2020, DeGrave, Sandlin, and Colt began a private group chat on Facebook to plan for the 6th.  They discussed "shipping guns" to Sandlin's residence in TN, where they would all meet before driving to D.C.  Colt said he would try to fly with his "G43," which the government understands to refer to a Glock .43 pistol.  They filled up their Amazon shopping carts with weapons and paramilitary gear to take to the Capitol.  For example, the defendant stated he was "looking at a 100w laser the thing that can instantly burn paper."  Sandlin responded: "Good god you want to burn these communists retinas?"  The defendant replied: "I dont but would rather do that then have to shoot someone" and "would be totally possible though."  To minimize his prior statements, the defendant added, "all purely self defence might I add.  but will be ready."  Sandlin stated he was bringing his "little pocket gun" and a knife.  Later that evening, the defendant asked for Sandlin's address and then wrote that he had "about 300 worth of stuff coming to you."  Sandlin appears to have reviewed the defendant's list of Amazon

purchases and then wrote: "Nate is really ready for battle hahaha."  Sandlin and Colt later posted pictures of their recent purchases, including a glock holster, gas masks, and a helmet.  On January 3, 2021, the defendant posted a picture of various items of clothing with skulls on them, a helmet, and a face mask on Facebook, with the following caption: "Gearing up. Only a fraction of what I have. #fbappropriate #dc #jan6 #drdeath."  He also posted that he was "flying in with friends on the 6th. We're ready to do what is necessary to save the country."

On January 4, 2021, the defendant wrote Sandlin and Colt, "[w]e meet here at 10:00 a.m." and sent a screenshot of "wildprotest.com" depicting a map of the U.S. Capitol with a "Meet Here" notation in front of the building.  He also forwarded them a post from the Parler application stating: "#DoNotCertify #january6th" and "#stopthestealcaravan #darktolight #thegreatawakening #DRAINTHESWAMP," followed by his own commentary, "let em try us."

On January 5, 2021, the trio arrived in D.C. and picked up a fourth individual—a female— from Reagan National Airport.  That evening, Colt posted a video to his social media bearing the caption "Nate's bear mace was going off in his pocket and it started filling the van bear spray."  In the video, Sandlin states that bear mace was going off in the car, and both Sandlin and Colt can be seen coughing in the video.

DeGrave, Colt, and Sandlin ultimately brought the following weapons and other items with them in a rental car from Tennessee to the D.C. metropolitan area:  one Glock 43 pistol, one pocket gun, two magazines of ammunition, bear mace, gas masks, a handheld taser/stun gun, military-style vests/body armor, two helmets, an expandable baton, walkie talkies, and several knives.  Colt brought a gun to a rally in Washington, D.C. on January 5.  While in the Capitol on January 6, Sandlin and Colt were armed with knives, and Colt had bear mace in his backpack.  The defendant carried a walkie talkie, as did Colt.

It is unclear at present whether the defendant himself was armed with a weapon inside the Capitol on January 6, though, as described above, he brought bear mace and other military-style gear to the D.C. area and ultimately stuck close to his associates who were in fact armed in the Capitol.  In a selfie-style video posted to Colt's social media the morning of the riot, the defendant can be seen with Colt, Sandlin, and a female in a hotel room.  Colt discusses a "debate we've been having for days now:  should we carry our guns or not?"  The defendant says: "for the camera's sake, we're not going to carry," which Colt repeats for the social media audience.  Although the execution of the search warrant on his residence revealed a gun registered to the defendant, the government understands that the defendant did not bring his own gun to the D.C. area.

  *ii.*  *Events of January 6*

The defendant was dressed for violence on January 6—body armor, a helmet, and a face shield—and violence is what he sought out.  As the videos described below illustrate, the defendant's goal was to obstruct the Electoral College certification proceeding.  In the process, he assaulted several U.S. Capitol Police officers, which was also captured on video.

Investigators received a "selfie"-style video recorded by DeGrave, Sandlin, and Colt as an anonymous online tip.  In the video, recorded on January 6 prior to the riot at the Capitol, the three are eating in a booth at a TGI Friday's.  Sandlin says in the video, no less than three times, ***"freedom is paid for with blood."***  Sandlin is also heard saying:

> Alright so we have been at the protests…we were there pretty early, scoped it out…there were some scrimmages, I will upload the video later…I think a precursor of what is going to [happen] in a few hours.  People are really mad…it is just a precursor to what's going to happen…Either way there is going to be violence.

A little later in the video, Sandlin states:

> What is happening to this country is absolutely horrific, absolutely horrific…we are ready to occupy the state capitol if needed to…I

> urge other patriots watching this too, to be willing to take the
> capitol…***if you are watching this and you are a patriot and are
> here, I think it is time to take the capitol and I don't say that
> lightly***…. I am willing to do it, I willing to go and fight for this
> country.  Even if that means I have to sacrifice in some capacity.  It
> is not what I want to do…

In the video, Sandlin hands the device used to record the video to Colt and DeGrave.  Colt states that "they are leaving bricks everywhere.  There are piles of bricks.  It seems like they are encouraging people to riot, because they are leaving stacks of bricks around the city."  Sandlin interrupts Colt, stating "allegedly."  Colt replies: "No, there are pictures, dude…Nate, show him." DeGrave then shows a picture on his phone of what appeared to be a stack of bricks.  Sandlin proceeds to ask "Nate" if he wants "to say something," at which point DeGrave responds:

> We are out here protecting the country, if shit goes down, if Pence
> does what we think he is going to do.  Then we are here to defend
> this city, defend any city in this country.  Let Antifa try us, we are
> here, we are ready.  I say bring it.  We are not silent anymore.

Colt then says: "The whole thing is a scam, dude.  The whole election, they can't just steal an election.  Like they are trying to do in Georgia last night.  It is a lie."  DeGrave responds: "We are sick and tired of the fucking lies.  ***It is time to put an end to this once and for all***."  Sandlin replies: "You either have conviction and you stand up for what you believe in or you sit down and shut the fuck up…"  Towards the end of the video, Sandlin stated:

> ***If we need to occupy the capitol, we will occupy the capitol.***  You
> guys are driving all the way to D.C. and you are missing the rally.
> We have been at the rally, we went last night, we have been at the
> rally since six in the morning.  We needed to grab a bite to eat, and
> like decompress because we went through a few intense moments
> and also regroup and plan for the next….***one o'clock is when it is
> all going to go down.  So we are going to be there back by one
> o'clock when it is action time it is game time.***

These statements appear to refer to the joint session of Congress at the U.S. Capitol building that began at approximately 1:00 p.m. Eastern Standard Time (EST).

Videos posted to Colt's social media show Colt, Sandlin, and DeGrave walking down Pennsylvania Avenue towards the Capitol. Colt asks DeGrave how he feels, to which DeGrave responds, "readier than ever." In another video of Colt and DeGrave walking toward the Capitol, Colt says, "It's a historic day. To save America. Save freedom. Save the way of life that we love. Save everything that our ancestors fought for and laid down their life for." The three ultimately joined the mob and entered the Capitol building through a door to the rotunda.

Surveillance footage from the entrance to the Capitol rotunda depicts a mob outside attempting to gain entry through a door. The door's glass windows are damaged. Individuals already inside can be seen moving benches blocking the door to try to let the mob in, at which point three U.S. Capitol Police ("USCP") officers move in to stand guard in front of the door. The defendant, Sandlin, and Colt are then seen entering the area, along with approximately twenty to thirty other individuals. The USCP officers are without backup.

Sandlin approaches the officers and appears to be yelling and pointing at them. Sandlin continues to yell, and DeGrave moves to his side. Immediately thereafter, the crowd, including DeGrave and Sandlin, begins pushing the officers and slowly forces the door behind the officers open, allowing the mob outside to begin streaming in. Rather than shy away, DeGrave continues to engage and records the ongoing attack on the officers. Sandlin can be seen attempting to rip the helmet off of one of the USCP officers, an apparent attempt to expose him and render him vulnerable as the mob surrounds him.

DeGrave and Sandlin continue to engage with the crowd near the entrance, with at least one officer still trapped in the midst, until Colt taps the defendant on the shoulder and leads the two away and up nearby stairs. Around this time, Colt shouted something to the effect of "we have to get to the Senate" and "there's no turning back now, boys, we're here."

14

They eventually made their way to the Senate.  Additional surveillance video footage from the Capitol Senate Gallery provides a view of a hallway and several sets of doors, which lead to the upper balcony of the Senate Chamber, where shortly before the Senate and the Vice President had been convened for the Electoral College vote count certification.  The beginning of the video clip shows several unidentified subjects in the hallway.  A USCP officer (hereinafter "USCP1") can be seen entering one of these sets of doors and is shortly joined by two other USCP officers ("USCP2" and "USCP3").  As part of their official duties, USCP1, USCP2, and USCP3 were clearing individuals out of rooms and securing the doors.

Approximately 27 seconds into the video clip, Sandlin enters the view of the security camera.  Shortly thereafter, USCP2 and USCP3 move toward the second set of doors to start to usher people out, while USCP1 finishes locking the first set of doors.  Sandlin can be seen walking next to USCP1 as he approaches the second set of doors, and while USCP2 is attempting to close the second set of doors.  Sandlin cuts in front of USCP1 and attempts to wrestle the door away from USCP2.  DeGrave then joins Sandlin in a shoving match with the USCP officers in an attempt to keep the door open.  Following this assault on USCP officers, DeGrave bragged that he punched an officer "three or four times."  As the three USCP officers make their way away from the crowd, DeGrave, Sandlin, and several others are observed on the video footage acting in an aggressive manner towards the officers.  DeGrave puts up his fists as if to begin boxing one of the retreating USCP officers.  As the USCP officer steps away, DeGrave can be seen banging his chest.

Shortly thereafter, the defendant, Sandlin, and Colt entered the now open doors and reached the upper balcony of the Senate Chamber, which members and staff of Congress and the Vice President had already evacuated.  Colt handed the GoPro, which he had been carrying and using to record the riot, to DeGrave, as he prepared to jump down to the floor of the Senate Chamber.

After Colt jumped down, DeGrave was one of several individuals yelling at Colt to take documents and laptops.  Shortly thereafter, the three were separated and did not meet back up until they were outside the Capitol.

iii.     *Post-January 6 Activities*

The defendant, Sandlin, and Colt left D.C. and drove across country almost immediately after their unlawful entry into the Capitol and were well aware of the criminal nature of their actions that day.  Indeed, in a Facebook group chat with DeGrave, Colt, and the female they picked up from the airport, Sandlin stated that they had left D.C. to get "to a safe spot," and that they were "at risk for serious jail time."  The defendant ultimately returned to his residence in Las Vegas.

The search warrant return on the defendant's Facebook account reveals that he deleted dozens of messages related to the insurrection and his involvement in it.  In other words, he destroyed evidence.  He appears to have directed others to delete their private messages to him on Facebook and also directed Sandlin shortly after the riot to "untag and delete all posts."  The defendant, Sandlin, and Colt downloaded an encrypted messaging application after the Capitol riot to continue talking to each other, including about potentially selling their footage of the riot so they could get rich and be interviewed on podcasts.  The defendant also encouraged several individuals on Facebook to download the encrypted messaging app wickr after January 6 to communicate about the events at the Capitol.

On January 9 and 10, the defendant privately messaged with a third party about providing footage to produce a documentary.  He told the third party to download and call him on wickr, and that it was "going to absolutely blow your mind what I will tell you."  The defendant later stated that he would have to "talk my boy into it," "go to Idaho to get [the footage]," and that it was "with his attorney."  The government understands that the defendant was referring to footage of the

insurrection within the possession of Colt, who lives in Idaho.  The defendant also told the third party in relation to the proposed documentary that they would "have to go over legal matters as well as being able to provide a barrier of protection."

On January 19, 2021, the defendant conversed with an individual via Facebook Messenger regarding Sandlin's whereabouts.  When asked if he had seen Sandlin, the defendant said, "No we were supposed to get breakfast but he ended up leaving early to go to another state."  He added that Sandlin "[s]aid he's keeping it moving," and that he "was on ny post" and will "def[initely] get a charge."  As described below, Sandlin was arrested at DeGrave's residence nine days later.

On January 24, 2021, the defendant posted on Facebook regarding litigation over the 2020 election, stating that "[c]ases were dismissed … regardless of the allegations or the evidence presented, and 100s of sworn affidavits."  On this thread, he also commented that "[t]he corruption is endless."

### iv.    Arrest

On January 28, 2021, cell-site data for Sandlin's phone received pursuant to a search warrant led investigators in the FBI Las Vegas division to locate and visually identify Sandlin's vehicle parked outside the Las Vegas apartment complex where DeGrave was confirmed to reside.  That same day, Sandlin was spotted leaving the apartment and taken into custody by the FBI.  Based on the defendant's actions on January 6, 2021, a complaint and arrest warrant for DeGrave were issued on January 28, 2021, and DeGrave was arrested at his residence.

Following his arrest, law enforcement read the defendant his Miranda rights, which he waived.  He then proceeded to lie to the FBI.  Specifically, he stated "I was not inside the Capitol" the day of the riot.  He denied being captured on security camera footage alongside Sandlin and Colt inside the Capitol, stating that "that's completely shocking to me.  I though the only reason I

17

was here is because I was letting Ronny stay with me."

## IV.    Argument

There are four factors under § 3142(g) that the Court should consider and weigh in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.  *See* 18 U.S.C. §3142(g).  As discussed in more detail above, the Court may also consider whether the defendant poses a serious flight risk or a serious risk of obstructing justice.  *See* 18 U.S.C. § 3142(f)(2); *Robertson*, 608 F. Supp. 2d at 92.  In consideration of these factors, the government respectfully submits that there are no conditions or combinations of conditions that can effectively ensure the safety of any other person and the community or the integrity of this proceeding.

District courts apply a de novo standard of review in evaluating a magistrate judge's detention decision.  *United States v. Karni*, 298 F. Supp. 2d 129, 130 (D.D.C. 2004).  Even under de novo review, the defendant has failed to proffer any reason to disturb the decision of the magistrate judge in the District of Nevada ordering the defendant detained.

### A.  Serious Risk of Obstruction of Justice

The government's proffered facts clearly trigger a detention hearing under 18 U.S.C. § 3142(f)(2)(B).  *See, supra*, section II (citing recent oral rulings on detention in *United States v. Riley*, 21-cr-69 (D.D.C. 2021) (Mehta, J.) and *United States v. Calhoun*, 21-cr-116 (D.D.C. 2021) (Friedrich, J.)).  They also show, by clear and convincing evidence, that no combination of release conditions will "reasonably prevent the defendant from obstructing justice" and thus assure the integrity of this proceeding.  *See Robertson*, 608 F. Supp. 2d at 92.

Taking the Capitol by force to disrupt Electoral College vote count proceedings is the ultimate obstructionist act.  This is precisely what the defendant intended to do and did do.  He and his co-conspirators engaged in extensive planning and amassed weapons and paramilitary gear in advance of the insurrection on January 6.  They got in a rental car and drove multiple weapons, including his co-conspirator's guns and bear mace belonging to the defendant, cross country to the D.C. area.  Just days before the insurrection, the defendant asked friends for a recommendation of someone with "excellent aim" who could provide him firearms training for a "patriotic cause."

On January 4, 2021, the defendant made his intentions clear—he posted a map of the Capitol to the group chat with Colt and Sandlin stating to "meet here," as well as the hashtags "#DoNotCertify #january6th" and "stopthesteal."  The defendant ascribed to his co-conspirator's calls for violence and "tak[ing] the Capitol" on January 6, which he ultimately heeded.  These acts render the defendant a danger to the community and our democratic institutions.

Even after January 6, when the nation was reeling and the import of his actions should have become clear, the defendant decided that they were instead something to celebrate and publicize.  As discussed above, he engaged in talks with a third party to create a documentary using footage of the insurrection to glorify his and his co-conspirators' actions and profit from them.  The defendant clearly has not internalized how abhorrent his conduct was that day, despite his counsel's oral assertions at his arraignment to the contrary.  And he certainly did not accept responsibility for his actions when he lied to the FBI in his Mirandized interview.  There is also evidence that the defendant is simply untethered to reality, as he has stated that media outlets reporting that Joe Biden won the election are "all lying" and "fake news."

Finally, the defendant has engaged in obstructive acts relevant to *this* proceeding, which serve as an additional indicator of the likelihood that he would attempt to obstruct justice in this

case if he were released.  After being charged and arrested in this case and clearly advised of his rights, he blatantly lied to the FBI.  Before that, he harbored Sandlin, whom he essentially admitted to a friend was a fugitive, in his home.  Furthermore, the defendant was clearly savvy and determined enough to download encrypted messaging applications to discuss the events of January 6 and encouraging others to do so, which should give this Court great concern.

The core of the Bail Reform Act is ensuring that defendants abide by orders of the Court. But the defendant does not believe in the courts' authority.  In reference to the 2020 election litigation in courts across the country, he said "[t]he corruption is endless."  The defendant believes that the media, both left- and right-leaning, are "all lying" to him, and that the current President has been installed through massive corruption.

For the reasons outlined in this memorandum, including his prior obstructive acts and demonstrated lack of respect for institutional processes, it is hard to see how the Court could have confidence that the defendant will not continue to engage in obstructionist behavior were he to be released, or that he will comply with the orders of this Court.  The government thus submits that he poses a serious risk of obstructing justice, as well as a danger to the community, and should therefore remain detained pending trial.

### B.  Nature and Circumstances of the Offenses Charged

On January 6, 2021, the defendant assaulted multiple law enforcement officers attempting to protect the Capitol and members of Congress inside.  His role in contributing to the chaos that day is not hyperbole—the defendant himself can be seen on surveillance footage as part of a violent crowd pushing three outnumbered officers against a door and forcing that door open, allowing the mob outside to breach the Capitol and putting law enforcement officers and members and staff of Congress at grave risk.  On another occasion, the defendant tussled with an officer to keep the door

to the Senate Chamber open, later bragging that he punched an officer "three or four times."  The defendant's actions thus partly enabled other rioters to commit criminal acts inside the building. Surveillance footage paints a picture of the defendant as seeking out violence at every available opportunity.

The defendant's actions prior to the riot are perhaps even more disturbing.  The defendant and his co-conspirators amassed weapons and paramilitary gear, which they drove cross country to the D.C. area.  Prior to the riot, he sought out firearms training and even planned to "bring[] bullet proof clothing."  This is not the behavior of someone who intends only to protest peacefully. His actions leading up to the riot demonstrate planning, determination, and coordination to engage in violent conduct that day to "stop the steal" and prevent the certification of the electoral college results deeming Joe Biden the winner of the 2020 presidential election.  The defendant's comment that it was "time to put an end to this once and for all," following Sandlin's calls to "occupy the Capitol" and pay for "freedom … with blood," is particularly menacing.

Chief Judge Howell recently detained a Capitol riot defendant in part because "any indication that a defendant engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear, suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process," and that such "motives and steps taken in anticipation of an attack on Congress speak volumes to both the gravity of the charged offense, as a premeditated component of an attempt to halt the operation of our democratic process, and the danger a defendant poses not just to the community in which he resides, but to the American public as a whole."  *United States v. Chrestman*, 21-cr-218, ECF No. 23, at 15.  Such is the case here.  Chief Judge Howell detained that defendant after considering "[e]vidence of coordination with other participants before, during,

or after the riot indicates that a defendant acted deliberately to amplify and assure the success of the breach of the Capitol," or "urging rioters to advance on the Capitol or to confront law enforcement," adding that the "presence of either of these factors enhances the defendant's responsibility for the destabilizing events of January 6 and thus the seriousness of his conduct." *Id.* at 15-16. Both of these factors are present here. As part of a mob, the defendant forced an exterior door open, allowing others to breach the Capitol, and before the riot, he chimed in to Sandlin's calls to "take the Capitol" on social media, stating that it was "time to put an end to this once and for all."

On January 6, the defendant combined his criminal intention to interfere with the functioning of Congress with an assault on the law enforcement officers trying to protect that function. As a result, the nature and circumstances of the charged offenses overwhelmingly weigh in favor of detention.

### C. Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also clearly favors detention. As noted above, the defendant is captured on U.S. Capitol surveillance cameras attacking law enforcement officers on at least two occasions. Videos captured by the media and on social media corroborate the identification of the defendant as the person assaulting officers dressed in tactical gear that day. His own statements on social media corroborate his obstructionist intent. This factor thus weighs in favor of detention.

### D. Defendant's History and Characteristics

The Pretrial Services report reflects the defendant has three prior arrests, which the government understands related to misdemeanor offenses, and a conviction for underage possession of alcohol when he was twenty years old. While the government recognizes that the

defendant's criminal history is limited, his actions leading up to and on January 6, particularly his preparation and planning for violence, should give this Court great concern about the danger he would pose to the community if released.

Similarly, his failure to "exhibit[] any remorse for what occurred at the Capitol," apart from self-serving statements through his counsel as he moved for release from detention, provide "no evidentiary basis to assume that defendant will refrain from similar activities, if instructed, in the future." *See Chrestman*, 21-cr-218, ECF No. 23, at 28. To the contrary, the defendant sought to publicize his participation in the Capitol riot. *See, supra*, section III. And, as discussed above, he has engaged in obstructive acts such as deleting evidence, harboring a fugitive, lying to the FBI, and encouraging others to download encrypted messaging applications to discuss the events at the Capitol. His post-offense characteristics certainly militate in favor of detention, even if his pre-offense characteristics do not.

### E.  Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by a defendant's release, also weighs in favor of the defendant's detention. The charged offenses involve assaultive conduct as part of a violent mob. He intended to obstruct the certification of the Electoral College results, and he succeeded.

The danger the defendant caused as an active member of a violent mob cannot be understated. The entry of likely hundreds of rioters into the Capitol building and their destructive actions can be attributed, at least in part, to his role in overwhelming law enforcement and forcing an exterior door of the Capitol open. His actions and statements illustrate that he is a danger to our society and a threat to the peaceful functioning of our community.

## V.   <u>Conclusion</u>

For the above reasons, the Government submits that there is clear and convincing evidence that the defendant poses a serious risk to obstruct justice and is a danger to the community, and that there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community, or the integrity of this proceeding, if he were to be released.  The Court should therefore deny his motion for bond.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793


By: */s/ Jessica Arco*_____
Jessica Arco
Special Assistant U.S. Attorney
D.C. Bar No: 1035204
U.S. Attorney's Office for the District of Columbia
555 Fourth Street NW, Fourth Floor
Washington, DC 20530
Jessica.arco2@usdoj.gov
202-431-5198


Date:  March 19, 2021

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel, Joanne Slaight, Esq., this 19th day of March 2021.

/s/_____
Jessica Arco
Special Assistant United States Attorney