**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case Number 21-cr-90-PLF** |
| **NATHANIEL DEGRAVE,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SECOND SUPPLEMENT TO ITS OPPOSITION**
**TO DEFENDANT'S MOTION FOR BOND**

On April 14, 2021, the Court issued a Memorandum Opinion and Order directing the parties, among other things, to "file supplemental briefs addressing whether Judge Friedrich's decision and analysis in relation to Mr. Sandlin also supports detaining Mr. DeGrave, or whether, in view of the relative culpability of the two defendants and the reasons discussed by Judge Friedrich, that decision supports releasing Mr. DeGrave."  Mem. Op. at 2, ECF No. 28.  The Court also instructed the parties to address recent pretrial detention decisions by other Judges in this District in relation to Capitol riot defendants as well as propose release conditions should the defendant's bond motion be granted.

Accordingly, the government requests that the following facts, points, and authorities, as well as any other facts, arguments, and authorities presented at the upcoming bond hearing, be considered in the Court's determination regarding pretrial detention.

I.     **The Defendant Is More Similarly Situated to Sandlin and Sabol Than to Klein and Munchel**

As the D.C. Circuit recently instructed in the *Munchel* decision, "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided,

conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *United States v. Munchel*, No. 21-3010, at *8 (D.C. Cir. Mar. 26, 2021) (citation omitted).  The defendant clearly falls within the former category of Capitol riot defendants.

As the Court must consider the four factors outlined in 18 U.S.C. § 3142(g) when determining whether there are conditions of release that will reasonably assure the safety of the community, the government will outline its comparison of the defendant to the pretrial detention decisions cited in the Court's Memorandum Opinion and Order within a discussion of those four factors.

A.  Nature and Circumstances of the Offenses Charged

As surveillance video and other footage provided to the Court shows, the defendant assaulted multiple law enforcement officers on January 6 and impeded their ability to do their job. Specifically, he tussled with a U.S. Capitol Police officer as he, co-conspirator Ronald Sandlin, and others prevented officers from locking a set of doors to the Senate Chamber balcony. Immediately thereafter, he bragged that he "punched this guy, like, five times in the fucking neck."[1]  He did so in an attempt to gain access to where the Senators had been conducting the Electoral College vote certification, as evidenced by footage obtained from co-conspirator Josiah Colt's GoPro camera in which Colt leads the defendant and Sandlin through the Capitol exclaiming, "let's get to the Senate, bro…where they're meeting" and "no looking back now, boys…we gotta get to the Senate."  Upon breaching the Senate Chamber, Colt exclaims multiple times, in surprise, "it's empty."[2]  Suffice to say, this trio believed they were headed toward a direct

---

[1] The timing and context of his statement make clear he was referring to his assault on law enforcement just moments before.  This interpretation is corroborated by witness testimony.  Footage depicting this statement by the defendant has been provided to Chambers.
[2] Footage depicting these statements has been provided to Chambers.

confrontation with Senators certifying the vote count for what they believed was a fraudulent election.

In the *Sabol* pretrial detention decision, Judge Sullivan cited the "guideposts" articulated by Chief Judge Howell in the *Chrestman* decision to assess "the comparative culpability of a given defendant in relation to fellow rioters." *U.S. v. Sabol*, 21-cr-0035 (EGS) (D.D.C. April 14, 2021) [Dkt. No. 56], at *28-29 (quoting *U.S. v. Chrestman*, 2021 WL 765662, at *7-8 (D.D.C. 2021)). These guideposts include: "(1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning, for example, by obtaining weapons or tactical gear; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's words and movements during the riot—e.g., whether the defendant remained only on the grounds surrounding the Capitol or stormed into the Capitol interior, or whether the defendant injured, attempted to injure, or threatened to injure others." *Id.* at *28 (citing *Chrestman*, 2021 WL 765662, at *7-8) (internal quotation marks omitted).

Like fellow rioters Sabol and Sandlin, the majority of these guideposts "strongly support a finding that [the defendant's] comparative culpability in relation to his fellow rioters is high." *See id.* at *29. With respect to the first guidepost, the defendant has been charged with multiple felonies, including an assault on a federal officer and obstruction of an official proceeding. The defendant also aided and abetted the mob assault on three outnumbered officers near the Rotunda door, which allowed dozens if not hundreds of rioters outside the Capitol to breach the building and wreak further havoc, including law enforcement assaults, inside.[3]

---

[3] Footage depicting this mob assault has previously been provided to Chambers.

Regarding the second guidepost, like Sabol and Sandlin, and unlike Klein and Munchel, the defendant "engaged in prior planning that suggests his assaultive conduct and civil disorder did not merely arise in the context of a hysterical throng."  *See id.*  Like Sabol, he and his co-conspirators amassed paramilitary gear and weapons—including guns, knives, bear mace, and a stun gun—and drove them cross country to the D.C. area.  Like Sabol, even though the defendant made statements indicating he was "anticipat[ing] encountering counter-protesters" such as Antifa, it is undisputed that he was planning for, and to some extent reveling in the prospect of, violence.  *See id.* at *30.  Indeed, he sought out firearms training from "special forces or ex fbi" for a "very patriotic cause" just days before the riot.  Like Sabol and Sandlin, the defendant believed the 2020 Presidential Election was fraudulent and expressed sentiments such as "stop the steal" and "do not certify" in the days leading up to January 6, adding publicly on Facebook that he was "ready to do what is necessary to save the country."  As seen on footage of the defendant walking towards the Capitol, he exclaimed that he was "readier than ever."[4]  Like Sabol and Chrestman, "this amount of prior planning and intentionality suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process."  *Id. at* *30-31 (citing *Chrestman*, 2021 WL 765662, at *8).  This prior planning sheds light on the defendant's mental state and the lengths to which he will go to achieve his political ends, thereby distinguishing him from other rioters, such as Klein and Munchel, who have been released on conditions pending trial.  *See United States v. Klein*, 21-cr-236 [Dkt. No. 29] at *13-14 (D.D.C. 2021); *United States v. Munchel*, 2021 WL 1149196, at *8 (D.C. Cir. March 26, 2021).

---

[4] Footage depicting this moment has been provided to Chambers.

As to the third guidepost, there is no evidence at present that the defendant carried a weapon inside the Capitol that day, though he had access to the two knives and bear mace carried by his co-conspirators, of whom he was within a few feet for the vast majority of his time on Capitol grounds.  In addition, the defendant brought his own bear mace to the D.C. area, which he presumably, like his co-conspirator Colt, would have brought inside the Capitol had it not discharged prematurely the night before.  And of course, the defendant did not need weapons that day to assault law enforcement and prevent them from securing the Capitol.

As discussed above, regarding the fourth guidepost, the defendant coordinated and planned for violence with his co-conspirators Colt and Sandlin before January 6.  During the riot itself, he contributed to a mob that assaulted law enforcement and forced an exterior door open, assisted others in wrestling the Senate Chamber doors open from U.S. Capitol Police officers, and instructed rioters who had lowered themselves from the balcony to the Senate Chamber to "take laptops, paperwork, take everything…all that shit."[5]  Immediately before this statement, he tried to corral his fellow rioters, shouting that "we need everybody in here now."  The defendant and Colt also carried walkie talkies with them inside the Capitol, presumably to coordinate if needed.  With respect to coordinated actions after the riot, there is evidence that the defendant communicated with his co-conspirators via encrypted messaging applications about potentially selling their footage from January 6.

With respect to the final two guideposts, on the record before her, Judge Friedrich found that Sandlin had assumed a leadership role with respect to this group of individuals.  However, during Sandlin's calls for violence immediately preceding the riot—e.g., by urging fellow "patriots" to "take the Capitol" and repeating his battle cry, "freedom is paid for with blood"—the

---

[5] Footage of this moment has been provided to Chambers.

defendant was right by his side and chimed in with his own rhetoric, amping himself and the other two up for violent confrontation.  Finally, as detailed above, his words and movements both before and during the riot demonstrate that he "acted deliberately and dangerously."  *Sabol*, 21-cr-0035, at \*35.

Like Sabol and Sandlin, the defendant's actions "evince a clear disregard for the law, an aversion to the fundamental tenants of our democracy, and a willingness to act violently" in support of his ideology, "all of which indicate that he poses a danger to the community."  *Id.* at \*43.  Accordingly, the first § 3142(g) factor clearly weighs in favor of detention.

### B.  Weight of the Evidence Against the Defendant

The defendant is captured on surveillance and other footage committing assaults and engaging in other illegal activity.  While the defendant disputes that he made physical contact with law enforcement inside the Capitol, video footage provided to the Court belies this claim.  His own contemporaneous statements similarly refute his claim, as he bragged to a co-conspirator following the hallway assault that he "punched this guy, like, five times in the fucking neck."

Videos recorded by co-conspirators as well as his own statements on Facebook demonstrate the defendant's arguable eagerness to engage in violence on January 6 to defend his ideals—from a solicitation of firearms training for a "patriotic cause," to invitations to Antifa to "bring it," to his call to "put an end to [the lies] once and for all."  His acts of bringing bear mace and protective gear, military-grade or not, and actually wearing that gear on January 6 further bolsters this notion.  These actions, combined with his statements reflecting an agenda to "stop the steal" and prevent the certification of the 2020 Presidential Election, also serve as compelling evidence of his intent to obstruct the Electoral College proceedings on January 6 when he breached

the Capitol and assaulted law enforcement inside.  This second factor thus also weighs heavily in favor of detention.

                      C.  <u>Defendant's History and Characteristics</u>

Like Sabol, Sandlin, Munchel, and Klein, the defendant has limited criminal history.  Also like many of these defendants, the defendant's friends and family have submitted character letters in support of his release.  While his recent conduct may have indeed been an aberration to those who know him, the defendant's willingness, if not eagerness, to act violently in support of his ideology and beliefs about an allegedly stolen election should give this Court great concern about the defendant's character and state of mind at present and the danger he would pose to the community if released.  *See id.* at \*49.  Indeed, while he has expressed remorse to the Court through his counsel, well after January 6 the defendant was seeking to publicize and profit from his conduct in the form of selling video footage of the riot—not exactly the actions of someone who believed his conduct was wrong or shameful.

Furthermore, his recent conduct befits a person willing and able to obstruct justice in this case.  Like Sandlin and Sabol, he destroyed evidence that could be used against him in a criminal prosecution and, like Sabol, instructed others to do so as well.  He communicated with his co-conspirators and others after the fact about the events at the Capitol via encrypted messaging apps.  And he harbored Sandlin in his home and lied to the FBI after being clearly advised of his rights.  By contrast, there was no evidence that Klein or Munchel engaged in obstructive behavior after January 6.  In this case, in which there are two non-detained key witnesses who witnessed much of the defendant's illegal conduct leading up to and on January 6, there is a real risk that the defendant could seek to tamper with witnesses if he were released, particularly in light of his prior obstructive conduct.

While many judges in these Capitol riot cases have found that a lack of criminal history and evidence of good character before January 6 tip the balance, if only slightly, in favor of release on this third factor, the defendant's conduct during and after the riot paint an alarming and more recent picture of his character that militates in favor of detention. *See United States v. Robertson*, 608 F. Supp. 2d 89, 92 (D.D.C. 2009) (Lamberth, J.) (detaining defendant pending trial solely on obstruction of justice grounds).

### D.   Nature and Seriousness of Danger Posed by Defendant's Release

Like Sandlin and Sabol, there is no combination of release conditions that will reasonably assure the safety of the community, or the integrity of this proceeding, if the defendant were to be released.  In an effort not to repeat the prior discussion, given that this fourth factor "encompasses much of the analysis set forth above," the government will focus on the inability of release conditions to address the danger and obstruction risk posed by the defendant. *See United States v. Cua*, 2021 WL 918255, at *5 (D.D.C. 2021).

Like Sabol and Sandlin, the defendant's "history of a productive and peaceful life did not prevent him from committing horrific acts on January 6, 2021," or from planning for violence with excitement and anticipation, which should "inform the Court's view of his propensity for further violence" if released. *Sabol*, 21-cr-0035, at *58.  Like Sabol and Sandlin, he has displayed a sincerely held but misguided belief that the election was stolen, and he acted on those beliefs using violence.  As displayed in the video recorded by the defendant after Colt jumped down into the Senate Chamber, he believed they "made history" in breaching the Capitol that day.  And like Sandlin, he sought to celebrate and publicize his actions by selling footage of the riot and giving interviews.

In light of his actions leading up to and on January 6, as well as his documented mistrust of democratic institutions, including the courts where, in his words, "corruption is endless," it is hard to see how the Court could have any confidence that the defendant will not engage in obstructive or violent behavior were he to be released, or that he will comply with the Court's orders.

Importantly, the danger the defendant poses is concrete and continuing. *See Munchel*, 2021 WL 1149196, at *4. While the unique circumstances of January 6 may have passed, the defendant's recent willingness to engage in violence and motivation for doing so most likely have not. Like Sabol, "there is ample reason to believe that fight is not finished for [the defendant] and others like him, making the threat of further violence present, concrete, and continuing." *See Sabol*, 21-cr-0035, at *61-62 (citing various articles describing former President Trump's recent and continued remarks that the election was stolen). Indeed, on January 24, 2021, the defendant posted a picture of a poster of former President Trump on his wall, stating "My idol in my living room." The defendant is of course entitled to his political preferences. But given his prior acts of traveling across the country with weapons to "stop the steal" and interfering with the peaceful transition of power on behalf of his idol, and his idol's continued inflammatory rhetoric about a stolen election, the defendant continues to pose a concrete and articulable threat to the community.

The defendant also poses a concrete and prospective threat to this proceeding, given his prior obstructive acts. In particular, the defendant has shown that he is savvy and determined enough to communicate with others about the events at the Capitol via encrypted messaging applications, and it is unclear whether device monitoring—if offered by the local Pretrial Services Agency at all—would be able to detect such communications. Moreover, the defendant has offered

no proposed custodian to ensure that he does not utilize devices that are not monitored, a critical step which would have demonstrated a serious commitment to comply with the Court's orders.

As Judge Friedrich articulated with respect to Sandlin, while the defendant's "ability to commit future acts of violence or obstruction could be hindered by stringent conditions of release," this does not mean he would not pose a continued danger to the community based on his premeditated violent acts in service of his ideology on January 6. *See* Hr'g Transcript, *U.S. v. Sandlin*, 21-cr-88, at 20 (Apr. 13, 2021). Like Sandlin and Sabol, the defendant was well prepared to commit acts of violence that day, and that is ultimately what he did. And, despite a few self-serving social media posts, he relished in it, as evidenced by his efforts to produce a documentary using the footage he and his co-conspirators recorded during the riot.

## II.     Proposed Release Conditions, Should the Court Grant the Defendant's Motion

For the above reasons, the government submits that there is clear and convincing evidence that the defendant poses a serious risk to obstruct justice and that he is a danger to the community, and that there is no condition or combination of conditions that will reasonably assure the safety of the community, or the integrity of this proceeding, if he were to be released. The Court should therefore deny his motion for bond.

If, however, the Court determines that release is appropriate in this case, the government would request that the Court impose the following conditions: (1) home confinement with GPS monitoring and a third-party custodian; (2) restriction on the use of electronic devices solely for the purposes of work, medical appointments, and preparation of his defense in this case; (3) prohibition on the use of encrypted applications and software; (4) prohibition on contacting

witnesses in this case except through his counsel; (5) monitoring of pre-approved devices by

Pretrial Services for compliance with the prior conditions;[6] and (6) other standard conditions.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

By: */s/ Jessica Arco*_____
Jessica Arco
Special Assistant U.S. Attorney
D.C. Bar No: 1035204
U.S. Attorney's Office for the District of Columbia
555 Fourth Street NW, Fourth Floor
Washington, DC 20530
Jessica.arco2@usdoj.gov
202-252-5198

Date:  April 23, 2021

---

[6] It is unclear whether the local Pretrial Services Agency, presumably in Las Vegas, offers this service, but the government will attempt to confirm.  Device monitoring, for example, is not available in D.C.