UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :

v. : Criminal No. 21-cr-90

NATHANIEL DEGRAVE : Judge Friedman

**DEFENDANT NATHANIEL DEGRAVE'S THIRD SUPPLEMENT APPLICATION FOR MODIFICATION OF PRETRIAL DETENTION**

Defendant Nathaniel DeGrave, through undersigned counsel, respectfully submits the below memorandum in support of Mr. DeGrave's release.

## I. Detention Standard Under 18 USC § 3142 (f)( 2)(B)

Mr. DeGrave is charged for conduct on January 6, 2021 - events which this Court of Appeals has described as "the particular circumstances of January 6." United States v. Munchel, Nos. 21-3010, 21-3011, 2021 U.S. App. LEXIS 8810 (D.C. Cir. Mar. 26, 2021)

The government has conceded many details that compel Mr. DeGrave's immediate release: he was not armed during this event; Mr. DeGrave did not injure anyone; he did not destroy any property; he is not a flight risk; he has an exemplary non-criminal history.[1]

These uncontested facts bar a government motion under 5 of the 6 factors under 18 USC 3142(f) - the only factors under which a defendant - presumed innocent - can be detained. Mr.

[1] His only conviction is for underage drinking conviction more than 10 years ago - when he was 19 years old.

DeGrave is not charged with a crime of violence under 18 USC § 3142(f)(1), use or possession of a dangerous weapon, or any of the offenses Congress has considered to be so serious under that section that detention may even be considered. Nor can the government pretend, based on both his stellar history and the circumstances of this case, where Mr. DeGrave went home and stayed at his home after January 6, 2021, that he is a serious risk of flight for detention under 18 USC § 3142 (f) (2) (A).

All that is left for the government to argue, in a desperate attempt to detain Mr. DeGrave pre-trial, is the meritless claim that, under 18 USC § 3142(f)(2)(B), there is "a serious risk that [Mr. DeGrave] ***WILL*** obstruct or attempt to obstruct justice..." (Emphasis added.)

This claim fails miserably.

The standard

This Circuit has recently decided a case involving detention under 18 USC § 3142 (f) (1) (E) where the defendants' charges included possession of a dangerous weapon. While the standard under that section looks to danger to the community, the Court of Appeals decision is instructive in emphasizing that the Court must evaluate future dangerousness. "...[T]o order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community." United States v. Munchel, Nos. 21-3010, 21-3011, 2021 U.S. App. LEXIS 8810 (D.C. Cir. Mar. 26, 2021). It must be clear that the defendant "poses a concrete prospective threat to public safety." Id. at 13. Likewise, 18 USC § 3142 (f) (2) (B), under the plain language of the statute, the Court must evaluate the likelihood here of FUTURE obstruction.

The defense submits that, based on the unsupported excuses for obstruction it has put

forth to support detention in this case, the government has not met its burden, and Mr. DeGrave must be released.

**Obstruction Claims**

Ronald Sandlin's arrest

Contrary to the government's erroneous pleading, Ronald Sandlin was NOT arrested at or in front of Mr. DeGrave's apartment. A review of the FBI report for Mr. Sandlin's arrest reveals that he was arrested in front of an apartment complex located a 20-minute drive from Mr. DeGrave's home. He was arrested by the apartment complex where he was actually residing while in Las Vegas - which was NOT Mr. DeGrave's apartment. While the agents saw Mr. Sandlin get into a car by Mr. DeGrave's apartment building, they have indicated no evidence from their search of Mr. DeGrave's apartment that Mr. Sandlin was actually living at Mr. DeGrave's apartment. Mr. DeGrave was not in any way, shape or form "harboring a fugitive."

Statement at Arrest

The government states that when arrested, Mr. DeGrave denied being inside the Capitol. While other law enforcement agencies videotape, or at least audiotape, statements made at arrest, the FBI apparently assiduously avoids doing so. For that reason, it is impossible to adequately consider the circumstances and context of the statement.

Deletion of Facebook Posts

As stated previously, there is no evidence that Mr. DeGrave removed or deleted (also called "unsend" in Facebook) any Facebook posts from the Facebook group comprising the person attending the DC rally. Conversations before, during and after the rally from that group *remained*

*on his Facebook account* when obtained by the government in its warrant return months after the rally. While Mr. DeGrave did unsend conversations he had with other people after January 6, these were not posts to the people attending the rally, and the posts were made after January 6. Deletion of posts, or even complete accounts, often occurs publicly on the Twitter social media website, or Facebook, and is a belated act of common sense.

Private and encrypted messages are no more sinister than phone conversations, in which privacy is expected and protected by the U.S. Constitution. The fact of having a private conversation is not an act of obstruction. The government has not produced evidence that the private messaging was used for an illegal purpose.

Protected Actions After January 6

Efforts to distribute or sell a video of the events of January 6 is not illegal. In fact, the government concedes that Mr. DeGrave discussed consulting with a lawyer prior to taking any actions concerning the video (which he, himself, did not own or possess).

In addition, support of President Trump is not illegal, and an opinion that corruption was involved in the election is completely legal. As discussed further below, political speech is not only protected, but fundamental to the preservation of democracy. (Political views are no longer an issue concerning Mr. DeGrave, as he is over politics and political polemics.) Importantly, the government has produced no evidence that Mr. DeGrave has ever had affiliation with extremist political groups.

**Countervailing Evidence**

As previously described, Mr. DeGrave actively denounced the actions at the Capitol on his

Facebook posts as early as January 8, when other Trump supporters were discussing the events of January 6. Furthermore, Mr. DeGrave was clearly not a leader. He did not rappel down the Senate balcony, a la Josiah Colt (case no. 21-CR-74, infra), or post a video smoking marijuana in the Capitol, a la Ronald Sandlin (case no. 21-CR-88, infra). As such, his Facebook posts did not make headlines, and he was not pursued by the press. Yet when he was challenged on Facebook by other Trump supporters concerning the events of January 6, he repeated that the violence was real, and it was "sickening."[2] He maintained that while he fully supported Trump, that did not allow him to also support violence - even while being accused of being a "fake Trump supporter." His statements and responses to criticism were insightful and sincere. There is no evidence that these expressions were made by any defendants released pursuant to bond hearings, especially at a time so soon after the events of January 6. It is overwhelming evidence that his actions on January 6 were an aberration from an otherwise commendable past, and that, in fact, there is no serious articulable risk that Mr. DeGrave will obstruct justice (or be a danger to the community) if released.

The Government has not shown and cannot show that there is a serious risk that Mr. DeGrave will obstruct justice if released.

---

[2] Facebook Post by Mr. DeGrave on 2021-01-08:
"I am a big Trump supporter everyone knows that. But now that we are in a new year with a new president we really need to start coming together. Really tired of the violence and the division and we need to start fighting these wars with love and peace. The fact that people were killed over the week is truly sickening. Violence is not cool whether it comes from the left or the right. I condemned it when antifa did it and I condemn it now."

Additional Facebook posts are listed in Doc. 16.

Comparative Cases - Future Obstruction

The Court asked the parties to address other cases concerning bond in relation to the events of January 6. The defense could find NO cases in which a defendant has been held where, as here, the government has asserted detention solely under 18 USC § 1342(f)(2)(B) - serious risk of future obstruction.

United States v. Calhoun, 21-CR-116. Judge Friedrich released a defendant who allegedly claimed that he had smashed through barriers and police officers to enter the Capitol, pursuing retreating police officers and yelling names at members of Congress. (The government also sought detention for risk of flight under 18 USC § 1342(f)(2)(A)).

United States v. Riley, 21-CR-69. Judge Mehta released the defendant.

United States v. Caldwell. 21-CR-28, Judge Mehta released the defendant after reconsideration and additional pleadings by the defendant.

By contrast, in 2 cases where risk of flight was alleged under 18 USC § 1342(f)(2)(A), detention was ordered. Judge Nichols ordered detention of a defendant under section A who had a recent conviction for attempted first degree murder in United States v. Curzio, 21-CR-41. Judge Friedrich ordered detention of Ronald Sandlin under both sections A (flight) and B (obstruction). Mr. Sandlin owed $500,000 in back taxes, and moved around the country after January 6, 2021. United States v. Sandlin, 21-CR-88.

Clearly, the Courts follow the intention of Congress in emphasizing specifically enumerated classes of statutes, and risk of flight, in determining detention. Obstruction as a basis for detention has involved obstruction of actual court proceedings. See, e.g., United States v.

Robertson, 608 F. Supp. 2d 89 (D.D.C. 2009)(court found by clear and convincing evidence that defendants made concerted efforts to undermine trial). Here, the allegations, much less the evidence, do not meet the legal standard.

## II. The Government's Back Door to Detention

Despite the fact that the government cannot move for detention under an enumerated statute under 18 USC 3142(f)(1), requiring a finding of dangerousness to a person or the community, the government allocates the bulk of its argument to actions before or during January 6 to allege that Mr. DeGrave will be dangerous in the future.

Caselaw makes clear that this should not be a consideration. United States v. Ploof, 851 F.2d 7 (1st Cir. 1988); United States v. Himler, 797 F.2d 156 (3d Cir. 1986). (The government cites lower case opinions which do not follow these Circuit courts.) But even if the Court were to consider the factors under 18 USC § 3142(g), the government has not proven by clear and convincing evidence that there is no condition or combination of conditions that will reasonably assure the safety of any other person or the community.

Again, Munchel, supra, is instructive on this issue. In Munchel, the Court of Appeals emphasized that in determining whether an articulable threat is posed by the defendant to the community, the threat must be considered in context. Id. at 20. The Court considered "...the specific circumstances that made it possible, on January 6, for [the defendants] to threaten the peaceful transfer of power. The defendants had a unique opportunity to obstruct democracy on January 6 because of the electoral vote tally taking place that day, and the concurrently scheduled rallies and protests." Id. at 23. Under these circumstances, the presence of the group was critical

to their ability to commit the offenses. And the Court considered the actions of the defendants to be much more indicative of future dangerousness than their words. Despite the fact that one defendant entered the Senate gallery chanting, "Treason," and the other defendant said, while looking at the dais, "I want that f**king gavel," in fact neither took or destroyed property. Despite the fact that one defendant had a taser, the defendants did not in fact destroy property or injure anyone. Despite the fact that in interviews with the press after the event, one defendant showed no remorse, and indicated that he would do it again, and the other defendant said she would rather fight and die than live under oppression, the Court said that the District Court did not adequately consider all of the evidence - such as the unique circumstances of January 6, and whether the defendants in fact comprised a future threat in light of the particular circumstances of that day.

Here, the government chooses to bury the crucial facts that Mr. DeGrave did not injure anyone, and did not carry a weapon, behind a cacophony of words - mainly from persons who were not charged as coconspirators or even codefendants with Mr. DeGrave.[3] As such, the government has no legal basis to attribute their words or actions to Mr. DeGrave. And the words of Mr. DeGrave, himself, pale in comparison to the words of the defendant mother and son in Munchel. Even after January 6, one defendant stated, "I'd rather die as a 57-year old woman than

---

[3] The government gives no indication that anyone was actually listening to Mr. Sandlin as he played Robespierre at TGI Fridays ("Freedom is paid for in blood"). His statements were made after he attended Trump's rally encouraging attendees to march to the Capitol, and fight for the election. And the government did not see fit to credit Mr. Colt's declaration in the Senate chambers - "This is our house. Respect it. This is sacred ground." - to Mr. DeGrave.

live under oppression." The Court of Appeals clearly understood the long history of hyperbole in American politics, and looked to actions rather than words to determine dangerousness. "Rhetorical hyperbole" has traditionally added much to the discourse of this nation. Milkovich v. Lorain Journal Co., 497 U.S. 1, 3, 110 S. Ct. 2695, 2697 (1990)(case involving defamation charges). See also Watts v. United States, 394 U.S. 705, 89 S. Ct. 1399 (1969) (hyperbole indulged by defendant - "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." - was not a threat within statutory meaning).

It should also be noted that the government has provided no evidence that Mr. DeGrave used force on the grounds of the Capitol, or to enter the Capitol. In fact, a video provided to counsel this week shows what appears to be Mr. DeGrave entering the building with a group, through a wide-open door, and with no law enforcement officers at the entry.

III. **United States v. Ronald Sandlin, 21-CR-88**

The Court requested in its Order, Docket 28, that the parties address the bond decision in United States v. Ronald Sandlin, 21-CR-88.

The Court stated that, "The defendant in this case, Mr. DeGrave, and the defendant in Criminal no. 21-0088, Mr. Sandlin, are charged with engaging in concerted activity."

In fact, the 9-count indictment for Mr. DeGrave, docket 4, does not charge him with engaging in any activity with any other person. Likewise, the 11-count indictment for Mr. Sandlin, supra, docket 6, does not charge him with engaging in concerted activity with any other person. Josiah Colt, United States v. Josiah Colt, case no. 21-CR-24, is not charged with engaging in

concerted activity with any other person in his 4-count indictment. Colt, supra, docket 8.

The government proffers no rationale, rule or statute to attribute actions or words of a person who is not charged as a codefendant or coconspirator against Mr. DeGrave. Mr. DeGrave is not a party to the Sandlin case, and has no standing in that case. Mr. DeGrave was not able to contest any evidence or findings in that case, and has no due process or basic constitutional or procedural rights regarding that case. There is no basis in rule or law to attribute findings of fact in the Sandlin case to Mr. DeGrave's case. While there is an order detaining Mr. Sandlin (Sandlin, docket 31), as of the filing of this motion there are no written findings.

Regardless, in considering the Sandlin Court's oral findings as to Mr. Sandlin, only, it is clear that Mr. DeGrave is legally and factually less culpable than Mr. Sandlin, and must be released under the standards of the Bail Reform Act.

First, the government sought detention for Mr. Sandlin under 18 USC § 3142(f)(2)(A) - risk of flight. The Court found by a preponderance of evidence that he was a flight risk based on his tax debt and movement around the country. This, in and of itself, separates Mr. DeGrave from Mr. Sandlin. There is no allegation of flight risk concerning Mr. DeGrave.

In Sandlin, the Court found that Mr. Sandlin had a leadership role. Mr. DeGrave did not have a leadership role. He did not initiate the trip, and did not meet any of the persons on the trip, including Mr. Sandlin, until January 5, 2021.

The Sandlin Court found that Mr. Sandlin took steps to obstruct justice after January 6, including moving around the country. Mr. DeGrave returned to Las Vegas after January 6, and stayed there. He did not make any attempts to elude law enforcement.

The Sandlin Court found that Mr. Sandlin punched an officer at the Senate door. There is no credible evidence that Mr. DeGrave punched an officer, including from the officers, themselves.

The Sandlin Court found that Mr. Sandlin tried to remove an officer's helmet. No such allegation was made concerning Mr. DeGrave.

The Sandlin Court stated that he urged others to be willing to take the Capitol, through his lunchtime claim, "Freedom is paid for in blood." The Munchel Court has made clear that words need to be considered within context of actual actions, which would include the fact that Mr. Sandlin did not spill any blood. Regardless, Mr. DeGrave did not encourage blood, guts, or the initiation of violence. Rather, he said he would defend the city and country, which is quite different, particularly in context of the day's events.

## IV. Comparative Cases

The Court invited comparison of the following cases:

United States v. Sabol, 21-CR-35

Mr. Sabol was charged with 4 codefendants in a 16-count indictment, including assaulting officers with a dangerous weapon. The government moved to hold him under 18 USC 1342 § (f)(1)(A) - crime of violence, as well as 3142(f)(2)(A) and (B). He participated in the brutal assault of 3 officers, who were seriously injured. He stole an officer's baton and used it to attack an officer. One officer required staples to stop the bleeding of his head. After January 6 he "fried" his electronic devices in a microwave, moved his firearms, and planned to go to Europe to evade police. The officers he attacked were trying to help a protester who later died of her injuries. He

detected police presence at the airport, drove through several states, and was eventually found bloodied with self inflicted wounds in his car. Clearly, Mr. Sabol engaged in extreme violence, and continued to exhibit extreme conduct after January 6, 2021, leading the Court to believe that he continues to believe he is a "warrior," and a risk of further concrete violence.

United States v. Frederico Klein, 21-CR-236

Frederico Klein is a former State Department employee who was charged with 8 counts, including 3 felonies, for his actions act the Capitol. The Court considered whether he should be detained under 18 USC § 3142(f)(1)(A) - crime of violence. Klein went to the Stop the Steal rally outside the White House earlier that day, and then proceeded to go to the Capitol. At some point he tried to enter the Capitol through a tunnel, and struggled with officers - at the front line of the mob - for 38 minutes, until the officers were able to get the mob out. He ignored police commands to back up and go. Twice he was heard calling to the crowd behind him, "W need fresh people, we need fresh people. At one point he picked up a flagpole and passed it back to other rioters. A few minutes after this started he got hold of a police shield and tried to wedge it into a door to keep the officers from closing the door. Then he pushed the shield into an officer's body in an attempt to break the police line, and shoved it against other officers. Klein, supra, doc. 29, pp 2-3. His use of the shield against the police officer was a felony crime of violence under 18 USC § 111(b). Id. at 12.

The Court emphasized that, in order to hold a defendant, the government must establish that he poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. Id. at 7. (Citations omitted).

While the Court acknowledged that Klein tried to encourage other rioters by shouting, "We need fresh people, we need fresh people," on two separate occasions, those chants did not make him a de facto leader of the mob. The Court noted that "countless words of of incitement could be heard throughout the tunnel" while Klein was inside. Id. at 14-15. Coordination while part of a mob does not equate to leadership, according to the Court.

The Court also emphasized that Klein's objective appeared to be to "advance or maintain the mob's position in the tunnel, and not to inflict injury. He is not charged with injuring anyone." Id. at 15. While Klein could have caused injury, his actions were not like those who clearly sought to incapacitate or injure law enforcement members.

The Court opined that "Klein's conduct was forceful, relentless and defiant, but his confrontations with law enforcment were considerably less violent than many others that day, and the record does not establish that he intended to injure others."

Unlike other defendants, Klein has not exhibited any remorse, and his former top secret clearance reflects a substantial breach of trust. But his background also shows that he can lead a law abiding life.

Notably, while the government in DeGrave claimed to the Court that it is moving to hold DeGrave because assault charges against an officer is a "bright line" requiring detention, the Klein court pointed to defendants facing FELONY assault charges under § 111(b) - rather than the misdemeanor § 111(a) charges for Mr. DeGrave - yet the government did not oppose release. Cases cited by the Court are as follows:

See Statement of Facts (Jan. 7, 2021), ECF No. 1-1 & Min. Entry (Jan. 8, 2021), United States

v. Leffingwell, 21-CR-5 (D.D.C.) (defendant repeatedly punched officer with closed fist in attempt to push past wall of officers); Statement of Facts (Jan. 18, 2021), ECF No. 1-1 & Min. Entry (Jan. 19, 2021), United States v. Gossjankowski, 21-CR-123 (D.D.C.) (defendant activated taser within tunnel multiple times as he pushed towards the police line); Statement of Facts (Feb. 9, 2021), ECF No. 1-1 & Min. Entry (Feb. 17, 2021), United States v. Blair, No. 21-CR-186 (D.D.C.) (defendant struck an officer in the chest with a lacrosse stick). The Court also sited: Statement of Facts (Jan. 13, 2021), ECF No. 1-1 & Min. Entry (Mar. 2, 2021), United States v. Sanford, 21-CR-86 (D.D.C.) (defendant hurled a fire extinguisher that struck one officer and ricocheted off two other officers' helmets); Statement of Facts (Feb. 16, 2021), ECF No. 1-1 & Min. Entry (Apr. 9, 2021), United States v. Coffee, 21-MJ-236 (D.D.C.) (defendant pushed a crutch into an officer's body at the archway to the tunnel and then charged at several officers in the tunnel with the crutch.

The Court noted that in the above cases, while the action of the defendants were not as extended in time, as Mr. Klein's actions were extended, the intent of the other defendants appears to be to injure or incapacitate the officers. The Klein Court emphasized that Klein's conduct was directed toward advancing the mob's position, rather than inflicting injury.

Mr. DeGrave's actions in relation to the officers were of a very short duration - seconds - concerning each officer. And the video released to the defense this week indicates that Mr. DeGrave left the Senate balcony within a short time of entering, proceeded to exit the building voluntarily and without incident, and did not return to the Capitol.

As to the necessity of a concrete threat, now that the transition of power has been accomplished, there is no articulated threat. Munchel emphasized that the threat to public safety

must be continuing and prospective. Id. at 25. (Citations omitted.) Given these circumstances, conditions of release could be fashioned to ensure the safety of the community.

## V. Letters in Support of Mr. DeGrave

Mr. DeGrave has submitted the following letters of support:

- Docket 14 - Sealed Exhibit A - letter of relative
- Docket 15 - Exhibit B - letter of relative
- Docket 20 - Exhibit D - Letter of friend from Pennsylvania

Mr. DeGrave submits the following letters of support with this motion

(Unredacted letters are available to the government on request):

- Exhibit A - letter of former landlord (referenced in Docket 14 p. 2.)(The letter contains a clear typo, referencing 9/2021 rather than 9/20.)
- Exhibit B - letter of present landlord
- Exhibit C - letter of business associate
- Exhibit D - letter of friend from Nevada
- Exhibit E - letter of business associate
- Exhibit F - letter of business associate

## VI. Conditions of Release

While Mr. DeGrave asserts that, given the circumstances of this case, release on personal recognizance would satisfy the requirements for the safety of the community, he understands that the Court may impose additional conditions:

- GPS monitoring
- No travel to Washington, DC, except for Court appearances or as approved by the Court; or a 25-mile travel limit (As Mr. DeGrave supplements his income through food delivery services via scooter, and he has been without income for 4 months, he requests that he be permitted local travel.)
- Computer monitoring, if deemed necessary by the Court. Undersigned counsel has confirmed with Pretrial Services with the U.S. District Court for Nevada that computer monitoring is available. Mr. DeGrave's main source of income is through online services, and he will avail himself of any required monitoring of his computer.

Respectfully submitted,

/s/

Joanne D. Slaight, #332866
400 7th St, N.W., Suite 206
Washington, DC 20004
Phone (202) 256-8969
Email: jslaight@att.net