UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
        v.                              )        Criminal No. 21-0090 (PLF)
                                        )
NATHANIEL J. DEGRAVE,                   )
                                        )
        Defendant.                      )
_____)

OPINION

        Defendant Nathaniel J. DeGrave is charged in a nine-count indictment based on

conduct related to the events at the United States Capitol on January 6, 2021.  Following the

arrest of Mr. DeGrave on January 28, 2021, Magistrate Judge Daniel Albregts of the United

States District Court for the District of Nevada ordered Mr. DeGrave detained pursuant to 18

U.S.C. § 3142(f)(2).  Order of Detention Pending Trial, United States v. DeGrave, 21-mj-0109

(D. Nev. Feb. 3, 2021) [Dkt. No. 8] at 2.  At Mr. DeGrave's arraignment before this Court on

March 16, 2021, defense counsel moved orally for modification of pretrial detention and

immediate release.  Upon careful consideration of the extensive briefing, including supplemental

briefing that followed the arguments of the parties at the detention hearings on March 25, 2021

and April 26, 2021, the Court denied Mr. DeGrave's motion by Memorandum Opinion and

Order of May 6, 2021 [Dkt. No. 37].  This Opinion sets forth the Court's reasoning in support of

that order.[1]

_____

        [1]        The Court has reviewed the following materials in considering the pending
motion:  Sealed Statement of Facts ("Statement of Facts") [Dkt. No. 2-3]; Indictment
("Indictment") [Dkt. No. 4]; March 15, 2021 Pretrial Services Report ("Pretrial Services
Report") [Dkt. No. 12]; Government's Memorandum in Opposition to Defendant Nathaniel
DeGrave's Motion for Bond ("Gov't Opp.") [Dkt. No. 13]; Defendant Nathaniel DeGrave's

# I. BACKGROUND

Nathaniel J. DeGrave is charged in a nine-count indictment with three counts that the government states are charged as felonies:  Count One, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Count Two, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); and Count Three, Obstruction of an Official Proceeding and Aiding

---

Reply Application for Modification of Pretrial Detention ("Def. Reply") [Dkt. No. 14]; Sealed Exhibit A to Defendant's Reply ("Def. Reply, Sealed Ex. A") [Dkt. No. 15]; Defendant Nathaniel DeGrave's Supplement Application for Modification of Pretrial Detention ("Def. Suppl.") [Dkt. No. 16]; Government's Supplement to Opposition to Defendant's Motion for Bond ("Gov't Suppl.") [Dkt. No. 19]; Defendant Nathaniel DeGrave's Second Supplement – Application for Pretrial Release ("Def. Second Suppl.") [Dkt. No. 20]; Rule 5(c)(3) Documents as to Nathaniel J. DeGrave ("Rule 5(c)(3) Documents") [Dkt. No. 21]; Defendant Nathaniel DeGrave's Opposition to Government's Email Proffer of YouTube Video ("Def. Opp. Video Proffer") [Dkt No. 24]; Government's Second Supplement to its Opposition to Defendant's Motion for Bond ("Gov't Second Suppl.") [Dkt. No. 29]; Defendant Nathaniel DeGrave's Third Supplement Application for Modification of Pretrial Detention ("Def. Third Suppl.") [Dkt. No. 30]; Defendant Nathaniel DeGrave's Opposition to Government's Email Proffer of Additional Videos ("Def. Opp. Additional Video Proffer") [Dkt. No. 31]; Defendant Nathaniel DeGrave's Notice Regarding Conditions of Release ("Def. Notice Release Conditions") [Dkt. No. 33]; Transcript of March 25, 2021 Detention Hearing ("Mar. 25 Hr'g Tr.") [Dkt No. 42]; Transcript of April 26, 2021 Detention Hearing ("Apr. 26 Hr'g Tr.") [Dkt. No. 43].

The Court has also reviewed the following videos proffered by the government: Restaurant video.mp4 ("Restaurant Video") (Jan. 6, 2021) (selfie-style video filmed by Mr. Sandlin at TGI Fridays); FAGW5534.MP4 ("FAGW5534 Video") (Jan. 6, 2021) (selfie-style video filmed by Mr. Colt while walking toward the Capitol); Sealed Video 1 ("Sealed Video 1") (Jan. 6, 2021) (surveillance footage showing interior of Capitol building); Sealed Video 2 ("Sealed Video 2") (Jan. 6, 2021) (surveillance footage showing interior of Capitol building from another angle); Helmet grab assault (rioter footage).mp4 ("Helmet Grab Assault Video") (Jan. 6, 2021) (video filmed by member of crowd inside Capitol building); Video of trio near Capitol entrance.mp4 ("Video of Trio Near Capitol Entrance") (Jan. 6, 2021) (video filmed from upper level of Capitol building near Rotunda door); The US Capitol Breach As It Happened-MVullQb-Lec.mp4 ("Capitol Breach Video") (Jan. 6, 2021) (video filmed by member of crowd outside Capitol building); Movies & TV 2021-04-23 10-26-46.mp4 ("Movies & TV Video") (Jan. 6, 2021) (selfie-style video filmed by Mr. Colt inside Capitol building); Sealed Video 3 ("Sealed Video 3") (Jan. 6, 2021) (surveillance footage showing interior of Capitol building from another angle); Assault in Senate Gallery hallway.mp4 ("Senate Gallery Hallway Video") (Jan. 6, 2021) (video filmed by rioter inside Capitol building); GP020391.MP4 ("GP020391 Video") (selfie-style video filmed by Mr. DeGrave inside the Capitol building).

and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2.[2]  Mr. DeGrave is also charged with

six misdemeanors:  Count Four, Entering and Remaining in a Restricted Building or Grounds, in

violation of 18 U.S.C. § 1752(a)(1); Count Five, Disorderly and Disruptive Conduct in a

Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Six, Disorderly

Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Count Seven,

Impeding Passage Through the Capitol Grounds or Buildings, in violation of 40 U.S.C.

§ 5104(e)(2)(E); Count Eight, Act of Physical Violence in the Capitol Grounds or Buildings, in

violation of 40 U.S.C. § 5104(e)(2)(F); and Count Nine, Parading, Demonstrating, or Picketing

in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  Indictment at 1-4.  The

evidence proffered by the government in support of Mr. DeGrave's continued pretrial detention

and the procedural history of this case are described below.

### A.  Factual and Procedural History

Mr. DeGrave is a thirty-one-year-old resident of Las Vegas, Nevada who has

recently been self-employed in marketing and has worked as a personal trainer.  Def. Reply

¶¶ 4-6.  In late December of 2020, Mr. DeGrave began participating in discussions on Facebook

with two individuals, Ronald Sandlin and Josiah Colt, concerning plans to travel to Washington,

D.C. on January 6, 2021, the date on which Congress was scheduled to certify the Electoral

College vote count for the 2020 Presidential Election.  See Gov't Opp. at 6.  On

---

[2]      At the April 26, 2021 detention hearing the parties expressed differing views on
whether Count One of the indictment, charging a violation of 18 U.S.C. § 111(a)(1), gave Mr.
DeGrave adequate notice that he is charged with a felony rather than a misdemeanor.  See
Apr. 26 Hr'g Tr. 4:4-4:19; 13:14-17:19.  Based on a brief review of case law from other Circuits,
and dicta in Judge Bates' recent opinion in United States v. Klein, Crim. No. 21-236, 2021
WL 1377128, at *5 (D.D.C. Apr. 12, 2021), the Court has serious doubts as to whether a felony
violation has been charged.  It need not resolve this issue, however, in order to decide the motion
for pretrial release.

December 23, 2020, Mr. Sandlin posted a message on Facebook that included the following invitation:  "Who is going to Washington D.C. on the 6th of January?  I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon. . . . If you're going comment below or PM me so we can meet up."  Statement of Facts at 4; see also Gov't Opp. at 8.[3]  Mr. DeGrave responded to Mr. Sandlin's post, writing that he was "considering" joining and that he could "come to Nashville and drive there with you."  Gov't Opp. at 8.

In a December 30, 2020 Facebook conversation, Mr. Sandlin wrote to Mr. DeGrave, "Yo sorry bro I'm going back and fourth [sic] about going some people I respect are saying it may get dangerous."  Mr. Sandlin added, "Are you down for danger bro?"  Mr. DeGrave responded, "Im [sic] bringing bullet proof clothing" and "yes."  Gov't Opp. at 9-10.[4] Subsequently on December 31, 2020, Mr. Sandlin issued the following public Facebook post:

> Dear Patriots, I'm organizing a caravan of patriots who are going to Washington D.C. to stand behind our president Donald J. Trump.  I posted about this last week and a [sic] got almost a dozen messages from people asking how they can help or expressing their wish to participate somehow.  Josiah Colt, Nate DeGrave, and myself have already booked and paid for our trip to Washington D.C. but we could use your help and support!  Every dollar you contribute to us is a smack in the face to Antifa.  Every penny is a boot in the ass against tyranny.  Every Buffalo nickel is a body slam against China. If you can't be there in person this is the next best thing.  We will be documenting our journey and every contributer [sic] will get a personal thank you video shot on location in Washington D.C. and will be featured as a contributor on the video mini documentary. Share, comment, like, and hate on us in the comments.

---

[3]     The Court understands "PM" as a shorthand inviting other Facebook users to send a "private message" to the author of the post.

[4]     The government obtained Mr. DeGrave's private Facebook messages pursuant to a search warrant.  Gov't Opp. at 9.

Statement of Facts at 4; <u>see</u> <u>also</u> Gov't Opp. at 8-9.  This post included a link to a GoFundMe

fundraising page that featured a photoshopped image of Mr. Sandlin holding what the

government characterizes as a semi-automatic rifle.  Statement of Facts at 4; <u>see</u> <u>also</u> Gov't Opp.

at 9.  Mr. DeGrave commented on the GoFundMe page, "It's time the American people rise and

stand up for this country.  We're tired of the corruption."  Statement of Facts at 5; <u>see</u> <u>also</u> Gov't

Opp. at 9.  In a separate Facebook conversation, Mr. DeGrave described media outlets including

"cnn ny times, abc, fox, associated press" as "the fakers of the fake."  Gov't Opp. at 9.  In

response to another user's question regarding whether such outlets were "all lying when they say

Joe Biden won the election," Mr. DeGrave responded, "Correct."  <u>Id</u>.

        Also on December 31, 2020, Mr. DeGrave posted to Facebook, "Who can shoot

and has excellent aim and can teach me today or tomorrow."  Gov't Opp. at 10.  In response to a

another user's comment on this post Mr. DeGrave wrote:  "I want somebody special forces or ex

fbi to teach me"; "I want personalized training from the best"; and "I'm open to learning all the

essential skills.  Whatever is necessary to survive."  <u>Id</u>.  When another user made a

recommendation but cautioned, "he's not cheap," Mr. DeGrave responded that "this is for a very

patriotic cause."  <u>Id</u>.  In another Facebook conversation Mr. DeGrave wrote that he would be in

Washington, D.C. on January 6 with Messrs. Sandlin and Colt and wanted to "grow my army

strong so will probably be making connections out there."  <u>Id</u>.

        December 31, 2020 was also the day on which Messrs. DeGrave, Sandlin, and

Colt began a private group chat in which they discussed their plans for January 6, including

"shipping guns" to Mr. Sandlin's residence in Tennessee and selecting a location at which they

would meet before driving together to Washington, D.C.  Gov't Opp. at 10.  The government

alleges that Messrs. DeGrave, Sandlin, and Colt "filled up their Amazon shopping carts with

weapons and paramilitary gear to take to the Capitol," although the government does not clarify whether they followed through on purchasing this gear.  Id.  Mr. DeGrave wrote in the group chat that he was "looking at a 100w laser the thing that can instantly burn paper."  Id.  In response to a question from Mr. Sandlin regarding whether he wanted to use it to "burn these communists retinas," Mr. DeGrave replied, "I don't but would rather do that then have to shoot someone" but "would be totally possible though," adding, "all purely self defence [sic] might I add.  [B]ut will be ready."  Id.  The same day, Mr. DeGrave asked for Mr. Sandlin's address and wrote that he had "about 300 worth of stuff coming to you."  Id.  Mr. Sandlin wrote, "Nate is really ready for battle hahaha."  According to the government, Mr. Sandlin was reacting to a list of Mr. DeGrave's Amazon purchases.  Id. at 10-11.  The government does not describe the materials in this Amazon shipment, but Messrs. Sandlin and Colt later posted images of recent purchases, including a Glock holster, gas masks, and a helmet.  Gov't Opp. at 11.

On January 3, 2021, Mr. DeGrave posted on Facebook "a picture of various items of clothing with skulls on them, a helmet, and a face mask" under the caption "Gearing up.  Only a fraction of what I have.  #fbappropriate #dc #jan6 #drdeath."  Gov't Opp. at 11.  He also posted that he was "flying in with friends on the 6th.  We're ready to do what is necessary to save the country."  Id.  On January 4, 2021, messages from the group chat show Messrs. DeGrave, Sandlin, and Colt discussing where to meet in Washington, D.C.  Id.  Mr. DeGrave forwarded Messrs. Sandlin and Colt a post from the social media application Parler with the following hashtags:  #DoNotCertify, #january6th, #stopthestealcaravan, #darktolight, #thegreatawakening, #DRAINTHESWAMP.  Mr. DeGrave added, "let em try us."  Id.

Messrs. DeGrave, Sandlin, and Colt met at Mr. Sandlin's residence in Tennessee and drove together to the Washington, D.C. area, where they arrived on January 5.  Gov't Opp.

at 11.  The group allegedly transported the following weapons in their vehicle from Tennessee: "one Glock 43 pistol, one pocket gun, two magazines of ammunition, bear mace, gas masks, a handheld taser/stun gun, military style vests/body armor, two helmets, an expandable baton, walkie talkies, and several knives."  Id. at 11.[5]  The government concedes that it has no evidence that Mr. DeGrave carried any weapon with him to the Capitol on January 6, although it alleges that Messrs. Sandlin and Colt each carried knives to the Capitol and Mr. Colt carried bear mace. Id.

On January 6, Messrs. DeGrave, Sandlin, and Colt recorded several videos while in the Washington, D.C. area, but before going to the Capitol.  The first video, which the government did not submit to the Court, reportedly shows the three men in a hotel room along with a fourth individual who is not identified by name in the government's filings.  In the video, Mr. Colt reportedly states that the three had been debating "should we carry our guns or not?"  Gov't Opp. at 12.  Mr. DeGrave reportedly replies, "for the camera's sake, we're not going to carry."  Id.

The second video, which the Court has reviewed, appears to have been filmed by Mr. Sandlin on a mobile phone and shows Messrs. DeGrave, Sandlin, and Colt seated at a T.G.I. Fridays restaurant.  For the first six minutes of the video, Mr. Sandlin speaks to the camera at length about his political views and the need to "take the Capitol" and "sacrifice."  He exhorts other "patriots" watching to take similar action and states three times that "freedom is paid for

---

[5]    At the April 26, 2021 detention hearing, counsel for Mr. DeGrave disputed whether these weapons and gear actually entered the District of Columbia.  The government conceded that Messrs. DeGrave, Sandlin, and Colt spent the night of January 5 at a hotel in Maryland but asserted that they went to Maryland only after stopping at an Airbnb rental in the District of Columbia, which they deemed unsuitable.  See Apr. 26 Hr'g Tr. 34:9-35:2.

with blood." <u>See</u> Restaurant Video at 0:00-6:04.  Mr. Sandlin subsequently turns the camera to

face Messrs. Colt and DeGrave, who make the following statements:

> <u>DeGrave</u>:  Yeah, man, you know, we're out here protecting the
> country.  If shit goes down, if Pence does what we think he is going
> to do, then we're here to defend this city; defend any city in this
> country.  Let Antifa try us.  We are here, we are ready.  I say bring
> it.  We are not silent anymore, you know, so . . .
>
> <u>Colt</u>:  The whole thing is a scam, dude.  The whole election, they
> can't just steal an election.  Like they are trying to do in Georgia last
> night.  It is a lie.
>
> <u>DeGrave</u>: We are sick and tired of the fucking lies.  It's time to put
> an end to this.  Once and for all.

<u>See</u> Gov't Opp. at 12-13; Restaurant Video at 6:47-7:20.

At some point after this video was filmed, Messrs. DeGrave, Sandlin, and Colt

made their way to the Capitol.  The Statement of Facts includes a still frame from a video posted

to YouTube, which the government did not submit to the Court, showing Messrs. DeGrave and

Colt in the vicinity of the National Mall wearing helmets.  Mr. DeGrave, pictured on the right

with his face covered, is dressed in what the government describes as tactical gear and the

defense describes as a motorcycle face mask and jacket.  <u>See</u> Statement of Facts at 2; Gov't Opp.

at 22; Def. Reply at 5.



Figure 10, Statement of Facts at 9.  Mr. DeGrave wears this same attire in all of the videos

submitted by the government showing his subsequent movements on January 6.  In these videos,

Mr. DeGrave repeatedly shifts the position of his head gear so that at certain times it covers his

face and at other times it is perched on top of his head and exposes his face.

        The government submitted a selfie-style video filmed by Mr. Colt, which the

Court has reviewed, showing Messrs. DeGrave and Colt, dressed in this same manner, in the

midst of a crowd walking down a street.  See FAGW5534 Video.  Mr. Colt states, "There's the

Capitol in the background there.  We're all headed down there.  How you feeling, Nate?"  Mr.

DeGrave replies that he is "feeling ready, bro, readier than ever," to which Mr. Colt replies,

"Yeah, if there's a time to do it, it's now.  Today's the day."  See FAGW5534 Video

at 0:00-0:15.

        The government submitted eight videos depicting Mr. DeGrave's conduct and

movements inside the Capitol, some captured by surveillance cameras and others recorded by

rioters and uploaded to social media.  See Sealed Video 1; Sealed Video 2; Helmet Grab Assault

Video; Video of Trio Near Capitol Entrance; Movies & TV Video; Sealed Video 3; Senate Gallery Hallway Video; GP020391 Video.  The Court has reviewed the videos several times. The videos document Mr. DeGrave's conduct in three areas inside the Capitol, through which he appears to have moved in the following order:  the foyer inside the Rotunda doors; the Senate Gallery hallway; and the upper balcony of the Senate Chamber.

First, several videos show Messrs. DeGrave and Sandlin milling around a large open space on the interior side of the Capitol Rotunda door, which is closed and guarded by several Capitol Police officers.  See Sealed Video 1 at 0:00-1:04, 1:35-3:25; Sealed Video 2 at 0:25-1:13; 1:45-3:29; Helmet Grab Assault at 0:00-0:31; Video of Trio Near Capitol Entrance at 0:00-0:08.  At a certain point, a crowd of rioters inside the Rotunda, including Messrs. DeGrave and Sandlin, begin pushing against the Capitol Police officers.  Ultimately the mob succeeds in overpowering the officers and forcing open the doors from within, allowing the crowd outside the Capitol to stream into the building.  See Sealed Video 1 at 1:50; Capitol Breach Video at 3:25.  Messrs. DeGrave, Sandlin, and Colt can be seen exiting the frame of the camera and ascending a staircase.

Another set of videos shows Messrs. DeGrave, Sandlin, and Colt in the Senate Gallery hallway.  See Movies & TV Video at 1:30-2:01; Sealed Video 3 at 0:25-1:18.  As they and other members of the mob proceed down the hall, they approach several U.S. Capitol Police officers near a door to the upper balcony of the Senate Chamber.  Mr. DeGrave, along with Mr. Sandlin and several other insurrectionists, move rapidly and aggressively toward two officers in front of one set of doors and begin grabbing and pushing at the officers.  See Gov't Opp. at 15; Movies & TV Video at 1:35-1:45; Sealed Video 3 at 0:25-1:18.  Before entering the fray, Mr. DeGrave can be seen pulling his helmet down to cover his face.  Mr. DeGrave is discernible

10

lunging towards one of the officers and appears to be attempting to pull the officer away from the door.  The officers disentangle themselves from the mob and begin moving down the hall away from the door.  Messrs. DeGrave and Sandlin follow the retreating officers, gesturing and advancing aggressively towards them.  See Sealed Video 3 at 0:49-1:01.  One officer holds his fists up defensively in response to Mr. DeGrave's gestures.  See id.  A still image of the video, submitted by the government in its Statement of Facts, shows Mr. DeGrave, third from the right, with his face covered, holding up his fists in the direction of the officer, who is on the far right.



Figure 1, Statement of Facts at 3.  In the video, several other rioters step between Mr. DeGrave and the retreating officer in an apparent attempt to diffuse the situation.  See Sealed Video 3 at 0:56.  Mr. DeGrave proceeds to remove his mask and make statements to the retreating officer, but he does not follow the officer further.  See Sealed Video 3 at 1:04-1:09.[6]  Another

---

[6]        The video depicting this incident does not include audio.

still image of the video shows Mr. DeGrave, center right, with his face now uncovered, speaking

in the direction of the officer, who exited on the right side of the frame and is not pictured.



Figure 2, Statement of Facts at 3.  In the video, Mr. DeGrave turns around and follows the other

rioters through the door that the officers were forced to abandon, which is now unguarded.  <u>See</u>

Sealed Video 3 at 1:13-1:18.

A third set of videos show Mr. DeGrave in the upper balcony of the Senate

Chamber.  In a selfie-style video apparently filmed by Mr. Colt, Mr. DeGrave's legs and torso

are visible and he can be heard stating to Mr. Colt, "Yo, I punched this guy like five times in the

fuckin' leg."[7]  <u>See</u> Movies & TV Video at 3:24.  Mr. DeGrave later repeats, "I punched this guy

like five times in the fuckin' head . . . [inaudible] . . . He didn't see my face, though."  <u>See</u> <u>id</u>.

at 3:58.  Another video shows Mr. DeGrave standing in the upper balcony while other rioters

appear to be on the floor of the Senate Chamber.  Mr. DeGrave calls to the other members of the

---

[7]      The audio is somewhat muffled.  The government transcribes this as "neck" rather
than "leg."  <u>See</u> Gov't Second Suppl. at 2.

mob, "Yo, we need everybody in here, now!"  Running to the edge of the balcony he shouts onto the Senate floor, "Yo, take laptops, paperwork, take everything!  All that shit!"  GP020391 Video at 1:30.

Following the events of January 6, Mr. DeGrave returned to his residence in Las Vegas, Nevada.  Gov't Opp. at 16.  Based on the results of a Facebook search warrant, the government asserts that Mr. DeGrave "deleted dozens of messages related to the insurrection and his involvement in it."  Id.  The government adds that he "appears to have directed others to delete their private messages to him on Facebook and also directed Sandlin shortly after the riot to 'untag and delete all posts.'"  Id.  At some point after January 6, Mr. DeGrave began communicating with Messrs. Sandlin, Colt and others via the encrypted messaging application wickr.  Id.  Mr. DeGrave's communications with Messrs. Sandlin and Colt after the riot reportedly included discussion of "selling their footage of the riot so they could get rich and be interviewed on podcasts."  Id.  Mr. DeGrave communicated with a third party about providing footage for a documentary and asked this third party to call him on wickr.  Id. at 16-17.

The defense proffers that the Facebook warrant return also includes posts by Mr. DeGrave indicating remorse for his role in the violence at the Capitol.  On January 8, 2021, Mr. DeGrave wrote that while he remained "a big Trump supporter," he was "tired of the violence and division" and considered "[t]he fact that people were killed over the week [] truly sickening."  Def. Suppl. at 1.  Mr. DeGrave wrote a series of similar posts dated January 7 through January 9, 2021.  These posts discussed the "need to start having a more open dialogue" and Mr. DeGrave's view that "violence is never justifiable" and "[p]olitical violence never works."  Id. at 2.

On January 19, 2021, Mr. DeGrave told another individual in a Facebook message that Mr. Sandlin was "keeping it moving," "was on ny post" and would "def[initely] get a charge." Gov't Opp. at 17. On January 24, 2021, Mr. DeGrave wrote on Facebook about litigation concerning the results of the 2020 election, writing that "[c]ases were dismissed . . . regardless of the allegations or the evidence presented, and 100s of sworn affidavits." Id. On the same thread he commented that "[t]he corruption is endless." Id.

On January 28, 2021, Mr. Sandlin was arrested shortly after leaving Mr. DeGrave's apartment in Las Vegas, Nevada. Gov't Opp. at 17. Mr. DeGrave was arrested later that same day. Rule 5(c)(3) Documents at 1. The government reports that after law enforcement officers read Mr. DeGrave his Miranda warnings, Mr. DeGrave told the officers that he was not in the Capitol on January 6. Gov't Opp. at 17.

Mr. DeGrave appeared on February 3, 2021 before Magistrate Judge Daniel Albregts of the United States District Court for the District of Nevada, who ordered him detained pursuant to 18 U.S.C. § 3142(f)(2). Judge Albregts found that no condition or combination of conditions of release would assure the safety of any other person and the community or reasonably assure Mr. DeGrave's appearance as required. Order of Detention Pending Trial, United States v. DeGrave, 21-mj-0109 (D. Nev. Feb. 3, 2021) [Dkt. No. 8] at 2. Mr. DeGrave was then transferred to the District of Columbia and appeared before this Court on March 16, 2021, at which time his counsel moved orally for modification of the detention order and for immediate release. The Court held a detention hearing on March 25, 2021. The Court then continued the case pending a ruling on pretrial detention in the separate criminal action in which Mr. Sandlin is a defendant, as detention was also contested in that case and the Court deemed Mr. Sandlin's conduct, as described by the government, even more serious than Mr.

DeGrave's.  April 1, 2021 Memorandum Opinion and Order [Dkt. No. 23].  On April 13, 2021,

Judge Dabney Friedrich ordered Mr. Sandlin detained pending trial.  Order, United States v.

Sandlin, 21-cr-88 [Dkt. No. 31].  This Court immediately scheduled a resumption of the

detention hearing concerning Mr. DeGrave, which took place on April 26, 2021.

## II.  LEGAL STANDARD

Detention of a defendant pending trial is governed by the Bail Reform Act

of 1984.  If a defendant is ordered detained by a United States magistrate judge, that defendant

"may file, with the court having original jurisdiction over the offense, a motion for revocation or

amendment of the order."  18 U.S.C. § 3145(b).  "Although the D.C. Circuit has not ruled on the

matter, every circuit to consider the issue has found that a magistrate judge's detention order is

subject to de novo review" by a district court judge, and courts within this district apply de novo

review in evaluating a magistrate judge's detention decision.  United States v. Klein, 2021

WL 1377128, at *3 (citing United States v. Hunt, 240 F. Supp. 3d 128, 132 (D.D.C. 2017)).

"[T]he Court is free to use in its analysis any evidence or a rationale different than what the

Magistrate relied upon."  United States v. Karni, 298 F. Supp. 2d 129, 130 (D.D.C. 2004).

The Bail Reform Act authorizes several "carefully limited exception[s]" to the

general norm that defendants are not to be detained prior to trial.  United States v. Munchel, 991

F.3d 1273, 1279 (D.C. Cir. 2021) (quoting United States v. Salerno, 481 U.S. 739, 755 (1987)).

The Court's analysis of whether one of these exceptions applies proceeds in two steps.  First, for

a detention hearing to be held, the Court must make one of two findings:  either that the

defendant is charged with an offense falling in one of the categories enumerated under 18 U.S.C.

§ 3142(f)(1)(A)-(E), or that there is a serious risk that the defendant will flee or will obstruct

justice or attempt to obstruct justice, or threaten, injure, or intimidate a prospective witness or

juror, or attempt to do so, as set forth in 18 U.S.C. § 3142(f)(2)(A)-(B).  At this stage of the analysis, the parties may proceed by proffer, and the Court's decision concerning whether to hold a detention hearing is "based on even less information than a decision to detain or release" a defendant.  United States v. Singleton, 182 F.3d 7, 9 (D.C. Cir. 1999).  In other words, the determination pursuant to Section 3142(f) to hold a detention hearing in the first place requires less evidence than the determination pursuant to Section 3142(e) to detain a defendant, which is based on a preponderance of the evidence or clear and convincing evidence.  See id. (requiring greater evidence under Section 3142(f) "would blur two distinct statutory inquiries and would give more weight to fact intensive analysis at an earlier stage of the case than Congress appears to have intended").

Second, if the Court concludes that the statute authorizes it to hold a detention hearing, it then must evaluate whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'"  United States v. Munchel, 991 F.3d at 1279.  If the basis for detention is danger to the community, the government has the burden of proving this danger by clear and convincing evidence.  18 U.S.C. § 3142(f).  If the basis is risk of flight, the government must prove this risk by a preponderance of the evidence.  United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987).  Here, the government does not argue that Mr. DeGrave poses a flight risk, so the clear and convincing evidence standard applies.

16

The Court determines whether there are conditions of release that may reasonably assure the safety of the community and the appearance of the person by considering the following factors set forth at 18 U.S.C. § 3142(g):

> (1)  the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2)  the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g)(1)-(4).[8]  Once a detention hearing is triggered, the Court must consider all factors set forth under Section 3142(g), irrespective of the basis for holding the detention hearing.  See United States v. Singleton, 182 F.3d at 9.

The D.C. Circuit recently held that "to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community."  United States v. Munchel, 991 F.3d at 1283.  This threat "must also be considered

---

[8]     The Bail Reform Act also outlines certain circumstances whereby a rebuttable presumption may arise that no condition or combination of conditions will reasonably assure the safety of the community or the appearance of the person as required.  See 18 U.S.C. § 3142(e)(2)-(3).  No such presumption arises on the facts of this case.

in context" and "whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant." Id. This risk "need not be of physical violence and may extend to 'non-physical harms such as corrupting a union.'" Id. at 1282-83 (quoting United States v. King, 849 F.2d 485, 487 n.2 (11th Cir. 1988)).

A threat of future dangerousness may be based on the risk that no conditions "will reasonably prevent the defendant from obstructing justice." United States v. Robertson, 608 F. Supp. 2d 89, 92 (D.D.C. 2009); see also United States v. Manafort, 897 F.3d 340, 348 (D.C. Cir. 2018) (upholding revocation of bail based on witness tampering where no violence was involved); United States v. LaFontaine, 210 F.3d 125, 134-35 (2d Cir. 2000) (rejecting the argument that "attempts to influence the testimony of [witnesses] does not constitute the type of danger to the community that would support detention"); United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (holding that a general threat of witness tampering may justify pretrial detention); United States v. Gamble, Criminal No. 19-348, 2019 WL 6877755, at *6 (D.D.C. Dec. 17, 2019) ("[O]bstruction of justice does pose a serious danger to the community as contemplated under Section 3142(g)(4)."); United States v. Young, Case Nos. 12-CR-502, 12-CR-645, 2013 WL 12131300, at *7 (D. Utah Aug. 27, 2013) ("Danger to community may include non-violent propensities, such as a record of obstruction of justice.").

This danger does not arise whenever a defendant is charged with obstructive conduct; it instead arises from the risk that the defendants will obstruct the judicial proceeding or its integrity. See United States v. Salerno, 481 U.S. 739, 753 (1987) ("[A] primary function of bail is to safeguard the courts' role," which includes "ensur[ing] the integrity of the judicial process."); Hr'g. Tr. 33:14-33:19, United States v. Riley, 21-cr-69 (D.D.C. Feb. 24, 2021)("[W]hat (f)(2)(B) is really getting at is not just obstructive intent generally, but,

rather, the risk that somebody's going to . . . obstruct or attempt to obstruct a judicial

proceeding."); accord United States v. Demmler, 523 F. Supp. 2d 677, 683 (D. Ohio 2007);

United States v. Khashoggi, 717 F. Supp. 1048, 1051 (N.D.N.Y. 1989).

       If after considering the factors in Section 3142(g) the Court concludes "that no

condition or combination of conditions will reasonably assure the appearance of the person as

required and the safety of any other person and the community," it "shall order the detention of

the person before trial."  18 U.S.C. § 3142(e)(1).

## III.  DISCUSSION

### A.  Mr. DeGrave is Eligible for Detention Pursuant to Section 3142(f)(2)(B)

       The government sought a detention hearing pursuant to Section 3142(f)(2)(B)

because, it asserts, there is a serious risk that Mr. DeGrave will obstruct the integrity of this

judicial proceeding.  Gov't Opp. at 2-6, 18-20, 24.  In support of this assertion, the government

proffers that after January 6, Mr. DeGrave deleted social media posts; asked Mr. Sandlin to

"delete all posts"; transferred his conversations with Messrs. Sandlin and Colt, which previously

took place on Facebook, to encrypted messaging applications; encouraged others to download

encrypted messaging applications in order to communicate with him about events at the Capitol;

allowed Mr. Sandlin to stay in his home at a time when he believed Mr. Sandlin to be evading

law enforcement; and lied to the FBI about whether he entered the Capitol on January 6.  Id.

at 16-17.[9]  The government also represents that there are two non-detained individuals who are

---

[9]     Mr. DeGrave's counsel challenges the factual accuracy of the government's
proffer that Mr. Sandlin was staying with Mr. DeGrave.  Def. Third Suppl. at 3.  At the
April 26, 2021 detention hearing, the government acknowledged that it had been mistaken in
previously asserting that Mr. Sandlin was arrested outside Mr. DeGrave's apartment.  It clarified
that law enforcement began tailing Mr. Sandlin after he left Mr. DeGrave's apartment and
arrested him in another neighborhood a short drive away.  The government added that Mr.

"key witnesses who witnessed much of [Mr. DeGrave's] illegal conduct leading up to and on January 6," and who the government fears Mr. DeGrave may try to contact.  Gov't Second Suppl. at 7.  Finally, the government expresses concern that Mr. DeGrave lacks respect for the Court and the judicial process, citing his statement that "[t]he corruption is endless," in relation to litigation concerning the 2020 election.  Gov't Opp. at 20; see also Apr. 26 Hr'g Tr. 8:12-9:25.

The Court finds that the government has proffered evidence showing a serious risk that Mr. DeGrave may obstruct or attempt to obstruct this judicial proceeding.  Mr. DeGrave's choice to delete social media records after January 6 indicates a recognition that these records could provide important evidence in the case against him and a willingness to eliminate such evidence.  Mr. DeGrave's request that Mr. Sandlin delete messages suggests that Mr. DeGrave may seek to influence others who could provide evidence or serve as witnesses against him.  This is emblematic of the type of conduct that raises concern about obstruction of a judicial proceeding.  Judges in this district have commented on the absence of precisely such evidence in concluding that the requirements of Section 3142(f)(2)(B) were not satisfied in other cases.  See Minute Order, United States v. Sabol, 21-cr-35 (D.D.C. April 26, 2021) ("[Mr. Lopatic] did not, for example, delete text messages or social media posts; . . ."); Hr'g. Tr. 34:8-34:18, United States v. Riley, 21-cr-69 (D.D.C. Feb. 24, 2021) (concluding that the government had not presented sufficient evidence to satisfy Section 3142(f)(2)(B) and contrasting the case with another where "the government had presented evidence of destroying social-media posts, assisting others in evading police, directing others in terms of how to stash evidence").

_____

Sandlin later made a statement from jail to a third party confirming that he had stayed at Mr. DeGrave's apartment the night before he was arrested.  See Apr. 26 Hr'g Tr. 4:20-5:24.

This evidence of past conduct establishes a serious risk that Mr. DeGrave will obstruct this judicial proceeding in the future if released.  This meets the low bar required to justify holding a hearing pursuant to Section 3142(f)(2)(B).  See United States v. Singleton, 182 F.3d at 9.  The Court must therefore determine whether Mr. DeGrave should be detained pending trial in light of the factors set out in Section 3142(g).

### B.  Section 3142(g) Factors

#### 1.  Nature and Circumstances of the Offense Charged

The first consideration under Section 3142(g) is "the nature and circumstances of the offense charged."  18 U.S.C. § 3142(g)(1).  Chief Judge Howell has identified six guideposts for analyzing this factor in cases arising out of the assault on the Capitol, which other judges in this district have found helpful "to differentiate the severity of the conduct of the hundreds of defendants connected to the events of January 6."  United States v. Klein, 2021 WL 1377128, at *7 (citing United States v. Chrestman, 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021)).  These guideposts concern: (1) "whether a defendant has been charged with felony or misdemeanor offenses"; (2) "any indication that a defendant engaged in prior planning before arriving at the Capitol"; (3) "a defendant's carrying or use during the riot of a dangerous weapon"; (4) "coordination with other participants before, during, or after the riot"; (5) whether the defendant "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct"; and (6) "a defendant's words and movements during the riot" including "whether he "damaged federal property," "threatened or confronted law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot."  United States v. Chrestman, 2021 WL 765662, at *7-8.  The Court finds Chief Judge Howell's guideposts most helpful and will examine each in turn.

### a.  Felony or Misdemeanor Offenses

Mr. DeGrave is charged with at least two felony offenses and six or seven misdemeanors.  The felony charges – which include civil disorder and obstruction of an official proceeding – weigh in favor of detention.

### b.  Prior Planning

The government has proffered evidence that Mr. DeGrave took part in extensive planning in the weeks leading up to January 6, in coordination with Messrs. Sandlin and Colt. This culminated with Messrs. DeGrave, Sandlin, and Colt driving together from Tennessee to Washington, D.C. on January 5 and going to the Capitol together on January 6, and with Messrs. DeGrave and Sandlin jointly assaulting law enforcement officers inside the Capitol building and forcing their way into restricted areas.

Mr. DeGrave's own words and actions in relation to these planning activities demonstrate that he expected to engage in violence on January 6.  Most explicitly, Mr. DeGrave responded to Mr. Sandlin's question on December 30, 2020, "Are you down for danger bro?" by saying, "Im [sic] wearing bullet proof clothing" and "yes."  Gov't Opp. at 9-10.  Mr. DeGrave proceeded to wear what the government describes as tactical gear to the Capitol.  Statement of Facts at 2; Gov't Opp. at 22.  The defense argues that this was simply a motorcycle face mask and jacket, but Mr. DeGrave's statement to Mr. Sandlin that he was "bringing bullet proof clothing" undercuts any significance of that distinction.  <u>See</u> Def. Reply at 5; Gov't Opp. at 10. Irrespective of the technically correct term for Mr. DeGrave's attire, his statement made clear that he was dressed in anticipation of confronting and engaging in violence.  His decision to wear this outfit to the Capitol strongly "suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and

disrupting the democratic process." United States v. Chrestman, 2021 WL 765662, at *8; see

also United States v. Sabol, No. 21-35-1, 2021 WL 1405945, at *10 (D.D.C. April 14, 2021)

(rejecting the defendant's "argument that he did not plan to commit violence" when he "brought

tactical gear, including a helmet, steel-toe boots, zip ties, a radio and an ear piece" to the rally).

        The plans that Mr. DeGrave discussed with Messrs. Sandlin, and Colt to purchase

weapons and transport them to Washington, D.C. further establish that he did not arrive at the

Capitol with the intent to protest peacefully, only unwittingly to get swept up in the violence.  If

anything, Mr. DeGrave's statements suggest that he was planning for and anticipating even

greater violence than ultimately transpired.  See Gov't Opp. at 10 (Mr. DeGrave writing, "I don't

[want to use a laser on a human] but would rather do that then have to shoot someone . . . would

be totally possible though"); id. at 11 (Mr. DeGrave describing images on Facebook of clothing

and a face mask as "[o]nly a fraction of what I have").  While neither Mr. DeGrave nor his

associates ultimately brought firearms to the Capitol on January 6, the fact that they transported

at least two firearms from Tennessee to the Washington, D.C. area in their car is disturbing when

coupled with the statements in their chat, as is the fact that they were discussing bringing those

firearms to the Capitol.  See Gov't Opp. at 12.

        Nor can Mr. DeGrave's own role in the planning be characterized as that of a

hapless follower who was unaware that Messrs. Sandlin and Colt had piled weapons into their

shared vehicle, as defense counsel has suggested.  See Apr. 26 Hr'g Tr. 22:17-25:17.  The

government's proffered evidence indicates that Mr. DeGrave himself purchased gear in relation

to the planned trip, a fact he advertised on social media alongside the ominous hashtag

"#drdeath."  Gov't Opp. at 11.  Mr. Sandlin's response to a review of Mr. DeGrave's Amazon

purchases – "Nate is really ready for battle" – suggests that these purchases related to violence.

Gov't Opp. at 10-11.  Even Mr. Sandlin, the apparent ringleader of the group that included

Messrs. DeGrave, Sandlin, and Colt, seemed to profess shock when Mr. DeGrave stated he was

considering purchasing a laser that can burn paper, responding, "Good god you want to burn

these communists retinas?"  Id. at 10.  While the government does not specify who among

Messrs. DeGrave, Sandlin, and Colt claimed ownership of most of the weapons in their vehicle,

it does allege that at least one cannister of bear mace, which discharged accidentally on

January 5, was "Nate's bear mace."  Id. at 11.

       Mr. DeGrave's effort to obtain firearms training ahead of the Capitol insurrection

further demonstrates that he was planning for violence.  Mr. DeGrave's counsel contested the

significance of this at the April 26 detention hearing, arguing that there was no evidence that Mr.

DeGrave followed through or actually received such training and characterizing his social media

posts as puffery.  See Apr. 26 Hr'g Tr. 23:12-24:03.  Yet as defense counsel acknowledged, Mr.

DeGrave did not state it was a joke.  His call for someone that "can teach me today or tomorrow"

sounds serious and specific.  See Gov't Opp. at 10.  Viewed alongside the other steps Mr.

DeGrave took, including traveling to Washington, D.C. in a vehicle containing weapons and

gear, the Court has no confidence that this statement was mere hype.

       These planning efforts show that Messrs. DeGrave, Sandlin, and Colt – and Mr.

DeGrave in particular – expected not only to encounter violence on January 6 but to perpetrate it.

This factor weighs heavily in favor of detention.

### c.  Carrying or Use of a Dangerous Weapon

       The government concedes that "there is no evidence at present that the defendant

carried a weapon inside the Capitol" on January 6, though the government speculates that Mr.

DeGrave "presumably, like his co-conspirator Colt, would have brought [his bear mace] inside

the Capitol had it not discharged prematurely the night before." Gov. Second Suppl. at 5. Mr. DeGrave asserts that he did not bring a firearm, a knife, or bear repellant to the Capitol. Def. Reply ¶ 9. While Mr. DeGrave's other conduct in relation to acquiring weapons and transporting them to the Washington, D.C. area is serious, the fact that he did not ultimately bring a weapon with him to the Capitol on January 6 weighs against detention.

<u>d.  Coordination with Others</u>

Mr. DeGrave participated in a group chat with Messrs. Sandlin and Colt beginning on December 31, 2020 to plan for the events of January 6. Through this chat, they discussed shipping guns to Mr. Sandlin's residence; driving together to Washington, D.C.; and ordering weapons and paramilitary gear from Amazon. Gov't Opp. at 10-12. They also discussed as a group whether to bring weapons to the Capitol. <u>Id</u>. at 12. The planning activities described above appear to have been carried out largely in coordination.

Messrs. DeGrave, Sandlin, and Colt also continued to act in coordination after they arrived in Washington, D.C. The video recorded at the T.G.I. Fridays restaurant on January 6 shows them jointly discussing their plans for the afternoon, including Mr. Sandlin stating, "We are going to be there back by one o'clock when it is all going to go down." Statement of Facts at 8; Gov't Opp. at 13; Restaurant Video at 9:57. In the video, Mr. DeGrave suggests that he, Mr. Sandlin, and Mr. Colt are jointly "out here protecting the country" and foreshadows that "if Pence does what we think he is going to do" he and his associates "are ready" to "defend this city; defend any city in this country." Gov't Opp. at 13; Restaurant Video at 6:47. The videos submitted by the government further document that once inside the Capitol, the three individuals moved through the building in coordination. Messrs. DeGrave and Sandlin are both clearly visible in the crowd that forced open the Rotunda doors. <u>See</u> Sealed Video 1

at 1:40-3:15; Sealed Video 2 at 1:45-3:29; Helmet Grab Assault Video at 0:00-0:31.  Messrs. DeGrave and Sandlin are also both visible as part of the much smaller cluster of insurrectionists that came to blows with a U.S. Capitol Police officer in the Senate Gallery hall.  See Movies & TV Video at 1:37-2:01; Sealed Video 3 at 0:25-1:18.  The videos recorded from the upper balcony of the Senate Chamber show Messrs. DeGrave and Colt in conversation about their exploits.  See Movies & TV Video at 3:24-4:00 ("I punched this guy like five times . . . He didn't see my face, though.").

This ongoing coordination "indicates that [Mr. DeGrave] acted deliberately to amplify and assure the success of the breach of the Capitol" and weighs strongly in favor of detention.  United States v. Chrestman, 2021 WL 765662, at *8.

## e.  Leadership Role

Mr. DeGrave is not alleged to have played any formal leadership role in the assault on the Capitol.  While he participated in pre-planning with Messrs. Sandlin and Colt, the government's description does not suggest that he became the ringleader of this small group.  Instead, the evidence proffered by the government tends to indicate that Mr. Sandlin was the leader.  See Gov't Opp. at 8-9.  Mr. DeGrave appears to have developed concrete plans for traveling to Washington, D.C. only after responding to Mr. Sandlin's invitation on Facebook.  See Def. Reply ¶ 8.

Mr. DeGrave also did not play any "de facto leadership role in the assault." United States v. Chrestman, 2021 WL 765662, at *15.  While he can be seen in the videos as part of a crowd that forced open the Capitol Rotunda doors from within, enabling numerous additional rioters to stream into the building, he clearly was not the leader of that crowd.  In the videos captured near the Rotunda doors, he does not encourage other rioters to act forcefully or

violently, nor does he even appear to speak to the other rioters, with the exception of Mr.

Sandlin.  See Sealed Video 1 at 0:00-1:04.  When the rioters do begin pushing against the

Rotunda doors in the video, Mr. DeGrave can only be described as another member of the large

mob engaged in this effort.  See id. at 1:35-3:25.

On the other hand, Mr. DeGrave can be heard on additional videos telling other

rioters, "we need everybody in here now!" and then exhorting them to "take laptops, paperwork,

take everything!  All that shit!"  See GP020391 Video at 1:30-2:04.  This video also shows that

when Mr. DeGrave and others exited the Capitol they were met by cheers and applause from

others outside.  See id. at 4:05.  The videos do not, however, show other members of the mob

rallying around Mr. DeGrave, following his physical movements, or even necessarily listening to

his verbal pronouncements.  The Court concludes that "viewed in context, those [statements] –

though reprehensible – hardly establish that [Mr. DeGrave] was a de facto leader of the mob."

See United States v. Klein, 2021 WL 1377128, at *8 (holding that encouraging other rioters by

shouting "We need fresh people" did not make the defendant a de facto leader in the Capitol

insurrection).  This consideration weighs against detention.

### f.  Words and Movements During the Riot

Mr. DeGrave entered the Capitol building and engaged in violence directed at

Capitol Police officers as they tried to secure the building.  He was part of a crowd that pushed

open the Rotunda doors, overpowering law enforcement officers while simultaneously enabling

other rioters to enter the Capitol.  He came to blows with Capitol Police officers outside the

Senate Chamber and apparently succeeded in gaining entry to the upper balcony as a result.  He

encouraged other rioters to steal laptops and papers from the Senate Chamber.  His conduct

therefore exhibits a more "brazen disregard for restrictions on unlawful entrants" than that of

other rioters who remained outside the Capitol building.  United States v. Chrestman, 2021 WL 765662, at *8.  His "attempt[] to injure" law enforcement officers and incitement to "damage federal property" likewise exhibit a problematic "disregard for the institutions of government and the rule of law."  Id.

This factor distinguishes Mr. DeGrave from Mr. Colt, who has been released pending trial without objection from the government.  Gov. Suppl. at 1, 3.  Although the two were together for much of the Capitol insurrection, Mr. Colt is not charged with assaulting anyone inside the Capitol and the videos submitted by the government do not show him participating in the assaults alongside Messrs. DeGrave and Sandlin.  See id. at 3; see also Sealed Video 1 at 1:40-3:15; Movies & TV Video at 1:30-2:01; Sealed Video 3 at 0:25-1:18.  Around the same time that Mr. DeGrave was urging those around him to "take laptops, paperwork, take everything," Mr. Colt was calling on fellow rioters to "respect" the Senate Chamber, which he described as "sacred ground."  See Def. Third Suppl. at 8 n.3; Gov't Second Suppl. at 5; compare Movies & TV Video at 3:01-3:09, with GP020391 Video at 1:30-2:04.  Mr. DeGrave, who "actually assaulted police officers and broke through . . . doors" therefore is "in a different category" than Mr. Colt.  United States v. Munchel, 991 F.3d at 1284.  This consideration weighs in favor of Mr. DeGrave's detention.

In sum, four of the six Chrestman guideposts strongly weigh in favor of detention:  Mr. DeGrave is charged with felony offenses; engaged in extensive prior planning; coordinated with others in relation to the assault; and engaged in particularly egregious conduct while at the Capitol.  Two of the other guideposts weigh against detention:  Mr. DeGrave did not carry a weapon at or into the Capitol and did not play a leadership role in the insurrection.  On balance, the nature and circumstances of Mr. DeGrave's offenses support detaining him pending trial.

## 2. Weight of the Evidence

There is strong evidence in support of each of the offenses with which Mr. DeGrave is charged.  Social media posts document his involvement in coordination and planning prior to January 6.  <u>See</u> Statement of Facts at 5-6; Gov't Opp. at 8-12.  The government has submitted to the Court eleven videos that unambiguously depict many of the events and actions described, including videos of the discussion among Messrs. DeGrave, Sandlin, and Colt at a TGI Fridays restaurant ahead of the insurrection at the Capitol; Mr. DeGrave's involvement in forcing open the Capitol Rotunda doors; Mr. DeGrave's assault on a Capitol Police officer in the Senate Gallery hall; and Mr. DeGrave's call to other members of the mob to steal laptops and papers from the Senate Chamber.  <u>See</u> Restaurant Video; FAGW5534 Video; Sealed Video 1; Sealed Video 2; Helmet Grab Assault Video; Video of Trio Near Capitol Entrance; Capitol Breach Video; Movies & TV Video; Sealed Video 3; Senate Gallery Hallway Video; GP020391 Video.  Mr. DeGrave does not dispute that he is the individual in these videos.  The government has also represented that witness testimony corroborates some of the evidence it has submitted to the Court.  <u>See</u> Gov. Second Suppl. at 2 n.1.  This factor weighs decisively in favor of detention.

## 3. History and Characteristics of the Defendant

Under the third prong of Section 3142(g), the Court must consider "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," as well as whether a defendant was on probation, parole, release pending trial, sentencing, or appeal, or was completing another sentence at the time of the charged conduct.  18 U.S.C. § 3142(g)(3)(A)-(B).

Mr. DeGrave's criminal history consists of only three arrests, all of which the government understands to be related to misdemeanor offenses.  See Gov't Opp. at 22; Pretrial Services Report at 1, 3.  The defense represents that one arrest, the only one that led to a conviction, was for underage alcohol possession, and that another arrest relates to the charges in this case.  Def. Reply ¶ 4.  Mr. DeGrave was not on probation, parole, or release in relation to any other offense at the time of the alleged conduct.

Mr. DeGrave, a native of Pennsylvania, has lived as a tenant in Las Vegas, Nevada for three years, renting apartments in two separate condominiums.  He has submitted three letters documenting some moderate community ties:  two letters from his landlords in the area and one letter from a friend in Las Vegas.  See Def. Third Suppl., Exs. A-B, D.  Both landlords attested that Mr. DeGrave was a reliable tenant who paid his rent on time.  Def. Third Suppl., Exs. A-B; Def. Reply ¶ 5.

Mr. DeGrave has also submitted nine letters attesting favorably to his character and history as a law-abiding citizen.  These letters show that many who know Mr. DeGrave personally believe him to be a peaceful individual, a reliable community member, and unlikely to instigate violence in the future.  See Def. Reply, Sealed Ex. A at 5 (expressing confidence that, if released, Mr. DeGrave will appear as required and will not pose a danger to others); Def. Reply, Ex. B at 1 (attesting that Mr. DeGrave does not have the character of a revolutionary or a terrorist and is a "peaceful and respectful man"); Def. Third Suppl., Ex. C at 1 (describing Mr. DeGrave as "an individual of high integrity"); Def. Third Suppl., Ex. D at 1 (attesting that the author trusts Mr. DeGrave).

While Mr. DeGrave's conduct on January 6 stands in contrast to the characterizations in these letters, information available to the Court concerning Mr. DeGrave's

history and characteristics indicates that for most of his life, Mr. DeGrave has abided by the law.
He has formed relationships with some members of his community and has earned the respect of
numerous individuals who were willing to write letters to the Court urging his release.  This
factor weighs against detention.

4.  Nature and Seriousness of the Danger Posed by Release

The last factor that the Court must consider under Section 3142(g) is "the nature
and seriousness of the danger to any person or the community that would be posed by the
person's release."  18 U.S.C. § 3142(g)(4).  "[T]o order a defendant preventatively detained, a
court must identify an articulable threat posed by the defendant to an individual or the
community."  United States v. Munchel, 991 F.3d at 1282-83.

The government's theory of future danger is twofold.  First, it asserts that Mr.
DeGrave's alleged obstructive acts in the wake of January 6 show he is likely to attempt to
obstruct justice if released, and that in the face of such obstruction, no set of release conditions
can reasonably assure the integrity of the judicial proceeding.  See Gov't Opp. at 18; Gov't
Second Suppl. at 10.  Second, the government maintains that there is a serious risk that Mr.
DeGrave will engage in violence in support of his political ideology in the future, based on his
prior actions planning for violence on January 6, assaulting law enforcement officers at the
Capitol, forcing open doors inside the Capitol, and enabling other members of the mob to enter
the Capitol building and access restricted areas.  See Gov't Second Suppl. at 9; Apr. 26 Hr'g
Tr. 38:10-14.  The Court will address these arguments in turn.

a.  Risk of Obstruction

The Court agrees with the government that there is a serious risk that Mr.
DeGrave will obstruct or attempt to obstruct justice if he is released on bond.  The government

has proffered evidence that in the wake of January 6, Mr. DeGrave deleted his own social media messages related to the Capitol insurrection; asked others, including Mr. Sandlin, to delete and "untag" their posts involving him; and began communicating via an encrypted messaging application about the Capitol insurrection.  Gov't Opp. at 16.  The government has also represented that Mr. DeGrave allowed Mr. Sandlin to stay with him at a time when Mr. DeGrave understood that Mr. Sandlin was seeking to evade authorities, and that Mr. DeGrave lied to the FBI about whether Mr. DeGrave himself was inside the Capitol on January 6.  Id. at 17.  This conduct demonstrates a willingness to take action to impede law enforcement investigatory efforts in relation to the specific events of January 6.

Defense counsel argues that Mr. DeGrave's conduct in the wake of January 6 does not support an inference that he will seek to obstruct this proceeding in the future, citing his background and lack of significant criminal history prior to the Capitol insurrection.  Apr. 26 Hr'g Tr. 21:4-22:24.  While it is true that Mr. DeGrave has been arrested only three times (one of them in this case) and convicted once of only a minor offense, a "record of violence or dangerousness . . . is not necessary to support pretrial detention" and the absence of such a record is not "determinative on the issue of danger to the community."  United States v. LaFontaine, 210 F.3d at 134 (quotation marks omitted).  In evaluating the likelihood of future obstructive conduct, the Court simply cannot ignore the fact that Mr. DeGrave already took the steps described above to destroy evidence at issue in this very proceeding.  See United States v. Sabol, 2021 WL 1405945, at *18 (finding "a danger exists that, if released, Mr. Sabol may . . . attempt to prevent his prosecution from moving forward" because "he has already destroyed incriminating evidence and directed others to do so as well"); cf. Minute Order, United States v. Sabol, 21-cr-35 (D.D.C. April 26, 2021) ("Mr. Lopatic's violent acts during the January 6

Capitol Riots are not indicators for obstruction of justice . . . . He did not, for example, delete

text messages or social media posts . . . .").

        Defense counsel maintains that Mr. DeGrave's request to Mr. Sandlin to "untag

and delete all posts" is rendered less significant by the fact that Mr. DeGrave himself did not

delete the group chat that included Messrs. Sandlin and Colt.  <u>See</u> Apr. 26 Hr'g Tr. 19:19-20:12.

Yet as the government explained at the April 26 detention hearing, Mr. DeGrave was

"unsending" and deleting messages in conversations with other individuals about the Capitol

insurrection after January 6.  <u>See</u> Apr. 26 Hr'g Tr. 28:22-29:7; Gov't Opp. at 16-17.  The fact

that Mr. DeGrave did not delete his conversations with Messrs. Sandlin and Colt is much less

relevant to the likelihood of his obstructing this judicial proceeding in the future than the fact that

he deleted numerous other posts and conversations that could have provided relevant evidence at

a trial in this and related cases.

        The risk of Mr. DeGrave engaging in future obstructive behavior is "identified

and articulable."  <u>United States v. Munchel</u>, 991 F.3d at 1282.  The government represents that

there are two witnesses in the case against Mr. DeGrave – Mr. Colt and an unnamed woman –

who are currently not detained.  Gov't Second Suppl. at 7; Apr. 26 Hr'g Tr. 41:8-41:16.  The

government also states that there are two individuals who live in Las Vegas with whom Messrs.

Sandlin and Colt stayed upon their return from Washington, D.C..  According to the government,

Messrs. Sandlin and Colt left certain unspecified "items" with these individuals and may have

discussed the events at the Capitol with them.  Apr. 26 Hr'g Tr. 50:1-50:13.  The government

expresses concern that Mr. DeGrave may try to contact these witnesses and influence any

prospective testimony they might provide.  <u>Id</u>.  Given Mr. DeGrave's past conduct, including

asking Mr. Sandlin to delete messages and lying to investigators about his movements on

January 6, the Court cannot find that if released, he would not seek to influence the individuals

the government has identified, two of whom reside in the city to which Mr. DeGrave would

return.

        The Court also is not satisfied that restrictive release conditions could assure the

integrity of this judicial proceeding.  Even if Mr. DeGrave's computer and phone were

effectively monitored by Pretrial Services, he could interfere with witnesses, particularly those in

the Las Vegas area, through verbal communications.  Moreover, there are no release conditions –

and Mr. DeGrave has proposed no acceptable third-party custodian – to ensure that he does not

and would not utilize devices that are not monitored.  See United States v. Manafort, 897 F.3d

at 348 (affirming revocation of pretrial release where "there was no way to prevent Appellant

from accessing devices that would enable him to contact witnesses while released . . . and thus

no way to ensure that further witness tampering would not occur in the future unless he were

detained").[10]  The government correctly points out that Mr. DeGrave has already exhibited a

degree of sophistication in evading detection through encrypted messaging applications, and that

he has used such applications to correspond about the Capitol riot.  See Mar. 25 Hr'g

Tr. 14:6-14:11.

        Mr. DeGrave's demonstrated a lack of respect for the courts and the rule of law –

particularly in relation to litigation surrounding the 2020 election, which was a driving force

behind the Capitol insurrection – raises further concern that he would not comply with any

release conditions that this Court might impose.  See Gov't Opp. at 17 ("[c]orruption is

endless").  The Court may properly consider whether Mr. DeGrave is "unlikely to abide by

---

[10]    Pretrial Services has advised that a suitable third-party custodian must reside with the defendant and be capable of monitoring the defendant's physical movements.  See Def. Notice Release Conditions at 1.  Mr. DeGrave lives alone.  Id.

release conditions," because this is "relevant to the ultimate determination of 'whether there are any conditions of release that will reasonably assure . . . the safety of any other person and the community.'"  United States v. Munchel, 991 F.3d at 1280-81 (quoting 18 U.S.C. §§ 3142(f) and (g)); see also United States v. Manafort, 897 F.3d at 348 (affirming revocation of pretrial release based on finding that the defendant "was unlikely to abide by any conditions the District Court might impose").  "While Mr. [DeGrave] does not have an extensive history of obstruction of justice, the weight of the evidence presented by the Government supports that he has recently," and in relation to this very proceeding, "obstructed justice by attempting to, for instance, hide or conceal relevant evidence, which in turn presents a serious danger that he may do so again."  United States v. Gamble, WL 6877755, at *6.

The Court therefore concludes that there is an articulable future threat that Mr. DeGrave will seek to obstruct this judicial proceeding, and that no condition or combination of conditions can reasonably assure the integrity of the proceeding.

### b.  Risk of Future Violence

The Court also agrees that the evidence proffered by the government establishes a serious risk that in the future Mr. DeGrave may again engage in violence.  The government argues that Mr. DeGrave's prior acts of traveling across the country with weapons to "stop the steal" on behalf of former President Donald Trump, who has engaged in "continued inflammatory rhetoric about a stolen election," raise an articulable threat of future violence.  Gov't Second Suppl. at 9; see also Apr. 26 Hr'g Tr. 39:10-39:19.  The government suggests that this risk is particularly salient because Mr. DeGrave proclaimed as recently as January 24, 2021 that he considered Mr. Trump his "idol" and has stated that he believes mainstream news outlets are lying about the outcome of the 2020 election.  Id.; see also Apr. 26 Hr'g Tr. 38:22-39:19.

Of course, Mr. DeGrave has a First Amendment right to express his views on politics, the 2020 election, and the government.  The Court need not consider Mr. DeGrave's political preferences to conclude that he poses a serious risk of committing acts of violence in the future.  His conduct speaks for itself.  As recently as January 6, Mr. DeGrave participated in an assault targeting the institutions of government.  Mr. DeGrave was not carried away in the excitement of the moment; rather, his statements show that he planned to confront and perpetrate violence at the Capitol.  See Gov't Opp. at 9-10 ("'Are you down for danger bro?' . . . 'Im [sic] bringing bullet proof clothing . . . yes'"); id at 10 ("Who can shoot and has excellent aim and can teach me today or tomorrow. . . . this is for a very patriotic cause"); id. at 13 ("It is time to put an end to this once and for all.").  "[E]ven if [Mr. DeGrave's] statements were themselves protected, the First Amendment does not prohibit their consideration as evidence of motive or intent."  United States v. Chansley, 21-cr-3, 2021 WL 861079, at *9 (D.D.C. Mar. 8, 2021) (citing Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993)).

Mr. DeGrave's statements also demonstrate that he held a misguided belief that he should take matters into his own hands to defend the country against perceived corruption in democratic institutions.  See Gov't Opp. at 9 ("It's time the American people rise and stand up for this country.  We're tired of the corruption."); id. at 11 ("We're ready to do what is necessary to save the country."); id. at 13 ("We're out here protecting the country. . . .  we're here to defend this city; defend any city in this country.").  And Mr. DeGrave "did not simply hold these misguided beliefs; he acted on them."  United States v. Sabol, 2021 WL 1405945, at *17.  He assaulted police officers inside the Capitol, forcibly gained access to restricted spaces, and called on other members of the mob to steal papers and laptops from the Senate Chamber.  See Sealed Video 1; Sealed Video 2; Movie & TV 2021-04-23; Sealed Video 3; GP020391 Video.  These

acts distinguish Mr. DeGrave from other individuals who may hold similar views about the 2020 election, but who are not likely to drive across the country in a vehicle filled with weapons and assault law enforcement officers, as Mr. DeGrave did, on the basis of those beliefs.

Mr. DeGrave, "who actually assaulted police officers and broke through windows, doors, and barricades" on January 6, and "who aided, conspired with, planned, or coordinated such actions," is "in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." United States v. Munchel, 991 F.3d at 1284. The D.C. Circuit in Munchel drew "categorical distinctions between the violent and non-violent January 6 participants[,] explaining that the former are categorically more dangerous." United States v. Fairlamb, 21-cr-120, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021). Individuals such as Mr. DeGrave who fall unambiguously into the more dangerous category are particularly likely to pose a risk of future violence. See Judgment, United States v. Worrell, 21-3020 (D.C. Cir. May 5, 2021) [Doc. No. 1897399] (affirming district court denial of reconsideration of detention, in part because the district court found that the defendant "actually assaulted police officers," citing Munchel).

The Court acknowledges Mr. DeGrave's statements in the wake of January 6 that "[t]he fact that people were killed over the week is truly sickening" and "[v]iolence is not cool whether it comes from the left or the right." Def. Suppl. at 1. Yet the fact remains that Mr. DeGrave planned to engage in violence at the Capitol and proceeded to carry out that plan. The violence that resulted was an entirely predictable result of the steps Mr. DeGrave took. In the weeks following January 6, even as Mr. DeGrave publicly condemned the violence, he privately participated in conversations with Messrs. Sandlin and Colt about how they could "get rich and be interviewed on podcasts" by selling footage from the Capitol assault, and proceeded to

exchange messages with a third party about providing such footage for a documentary.  Gov't Opp. at 16.  Mr. DeGrave apparently sought to capitalize on his involvement in the riot, raising questions about the extent to which he has put that episode behind him, as defense counsel suggests.  See Def. Reply ¶ 8; Mar. 25 Hr'g Tr. at 22:5-22:8.  In view of Mr. DeGrave's actions in the weeks leading up to January 6, the Court is not convinced that Mr. DeGrave is no longer a danger merely because the exact circumstances of January 6 are unlikely to recur.

    Finally, for the same reasons that stringent release conditions would not assure the integrity of the judicial proceeding, the Court concludes that those conditions would be insufficient to prevent Mr. DeGrave from committing acts of violence if he were to be released. The Court concludes that Mr. DeGrave "is a danger to the community by reason of prior instances of violence . . . as well as a history of obstruction of justice" and that "no condition (or combination of conditions) could be imposed, short of detention, that would reasonably assure . . . the safety of the community" and the integrity of this judicial proceeding.  United States v. Zherka, 592 F. App'x 35, 36 (2d Cir. 2015).

## IV.  CONCLUSION

    For the reasons set forth above, the Court finds by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community, or ensure the integrity of this judicial proceeding, if Mr. DeGrave is

released pending trial.  Pursuant to this Court's Memorandum Opinion and Order of May 6, 2021

[Dkt. No. 37], defendant Nathaniel J. DeGrave shall be detained pending trial.

SO ORDERED.


_____/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  May 14, 2021